# EXHIBIT 2

| STATE OF MICHIGAN | | | CASE NO. |
|---|---|---|---|
| 6th Circuit | JUDICIAL DISTRICT<br>JUDICIAL CIRCUIT<br>COUNTY PROBATE | **SUMMONS** | 2022-197345-CZ |

**Court address**
1200 N Telegraph Rd, Pontiac, MI 48341, United States

Court telephone no.

Plaintiff's name(s), address(es), and telephone no(s).
George A. Sachs - pro se
1845 Woodland Ave.
Sylvan Lake, MI 48320

v

Defendant's name(s), address(es), and telephone no(s).
Wesley Scharmen
335 Old Creek Dr.
Saline, MI 48176

Plaintiff's attorney, bar no., address, and telephone no.

This case has been designated as an eFiling case, for more information please visit www.oakgov.com/efiling.

Instructions: Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

## Domestic Relations Case

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (form MC 21) listing these cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

## Civil Case

☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court, where

it was given case number _____ and assigned to Judge _____ .

The action ☐ remains ☐ is no longer pending.

Summons section completed by court clerk.

**SUMMONS**

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:

1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to file a written answer with the court and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date | Expiration date* | Court clerk |
|---|---|---|
| 1/23/2023 | APR 24 2023 | Lisa Brown |

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01 (9/19) **SUMMONS**

MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105

FILED   Received for Filing   Oakland County Clerk   1/20/2023 1:30 PM

FILED    Received for Filing    Oakland County Clerk    1/20/2023 1:30 PM

# OAKLAND COUNTY 6TH CIRCUIT COURT

|  |  |
|---|---|
| **GEORGE A. SACHS** )<br>d/b/a Paradyme Systems USA )<br>Plaintiff, *pro se* )<br>**v.** )<br>**RICARDO INC. / RICARDO PLC**, a )<br>foreign company having offices in Michigan; )<br> )<br>**WESLEY SCHARMEN**, as individual; )<br>**PHILIP MICHAEL**, as individual; )<br>**JZ CONSULTING LLC**; a Michigan )<br>corporation; )<br>**JULIE ZONA**, as individual; )<br> )<br>**POLARIS STRATEGIC** )<br>**COMMUNICATIONS LLC**, a Virginia )<br>corporation; )<br>**CHRISTINE FUENTES**, as individual; )<br> )<br>**ERNEST J. MONIZ**, as individual; )<br>**ALISON LABONTE**, as individual; )<br>**JOSE ZAJAS**, as individual; )<br>**DARSHAN KARWAT**, as individual, )<br>**PAMELA BRODIE**, as individual; )<br>**STEPHANIE HODGE**, as individual; )<br>**GARY NOWAKOWSKI**, as individual; )<br>**JOCHEM WEBER**, as individual; )<br>**MIT**, a Massachusetts private university; ) | **CASE NO: 2022-197345-CZ**<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES:**<br><br>1. CIVIL RICO 18 U.S.C. § 1962 (c, d);<br>2. FRAUD;<br>3. AIDING & ABETTING IN;<br>4. GROSS NEGLIGENCE;<br>5. BREACH OF CONTRACT;<br>6. BREACH OF IMPLIED CONTRACT;<br>7. OPERATION OF AN ILLEGAL LOTTERY;<br>8. CONTEST RIGGING;<br>9. FRAUDULENT MISREPRESENTATION;<br>10. FRAUDULENT CONCEALMENT;<br>11. UNFAIR BUSINESS PRACTICES;<br>12. UNFAIR COMPETITION;<br>13. UNJUST ENRICHMENT<br><br>========================<br>**JURY TRIAL DEMANDED**<br><br>paid |

1

1

**MIT SEA GRANT PROGRAM & TEAM**
2
**IOwec**, a division of MIT;
**STEFANO BRIZZOLARA**, as individual;
3

4
**CALWAVE**, a California Company;
5
**MARCUS LEHMANN**, as individual;
**M3 WAVE**; an Oregon Company;
6
**MIKE MORROW**, as individual;
7
**ATARGIS**, a Colorado Company;
**STEFAN G. SIEGEL**, as individual;
8

9
**OSCILLA POWER**, a Seattle Washington
Company;
10

11
**TIM MUNDON**, as individual;
12
**BALAKRISHNAN NAIR**, as individual;

13
**JENNIFER VINING**, as individual;
14
**RAHUL SHENDURE**, as individual;
**RTI WAVE POWER**, a Maine Corp.;
15
**JOHN ROHRER**, as individual;
16
**DICK K. P. YUE**, as individual;
**YUMING LIU**, as individual;
17
**SEAN LEWIS**, as individual;

18
**SEA POTENTIAL**, Rhode Island business;
19
**TIM MACDONALD**, as individual;
**PAUL BREWSTER**, as individual;
20

21
**SEWEC**, a California company;

22
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

2

00001

| | |
|---|---|
| NICK WYNN, as individual; | ) |
| BYRON BARNES, as individual; | ) |
| CAROL BENNETT, as individual; | ) |
| TOM BENSON, as individual; | ) |
| CASEY BIRMINGHAM, as individual; | ) |
| NICHOLAS GRAY, as individual; | ) |
| SEAN LAVELLE, as individual; | ) |
| HARVEST WAVE ENERGY; Contest | ) |
| Finalist, location unkown; | ) |
| | ) |
| WAVESWING AMERICA, a.k.a AWS | ) |
| OCEAN ENERGY a UK Company that | ) |
| posed as a Califonia Company with the help | ) |
| of Mirko Previsic; | ) |
| MIRKO PREVISIC, as individual; | ) |
| | ) |
| STEVENS INSTITUTE OF | ) |
| TECHNOLOGY a private N. J. university; | ) |
| | ) |
| MUHAMMAD HAJI, as individual; | ) |
| LEE FINGERSH, as individual; | ) |
| SCOTT JENNE, as individual; | ) |
| | ) |
| JAMES GOSE, as individual; (U of M) | ) |
| KEVIN MAKI, as individual; | ) |
| | ) |
| TROY LYONS, as individual; | ) |
| CURTIS LIBBY, as individual; (U of | ) |
| Maine) | ) |
| | ) |
| ANTHONY VISELLI, as individual; | ) |
| | ) |

3

**LOCKHEED MARTIN**, a Maryland )
corporation; )
)
**HONEYWELL INTERNATIONAL INC.**, )
a North Carolina conglomerate; )
)
**SANDIA NATIONAL LABORATORIES**, )
a subsidiary of Honeywell International, Inc. )
& previously Lockheed Martin; )
)
**VINCENT NEARY**, as individual; )
**ANN DALLMAN**, as individual; )
**BUDI GUNAWAN**, as individual; )
**DIANA BULL**, as individual; )
**KELLEY RUEHL**, as individual; )
**CHARLES MAHER**, as individual; )
**RE VISION CONSULTING LLC**; a )
California corporation; )
**MIRKO PREVISIC**, as individual; )
**MICHAEL TRIANTAFYLLOU**, as )
individual; )
)
**NEXT GEN TEAM;** )
**MIRKO PREVISIC**, as individual; )
)
**MCNATT OCEAN ENERGY, a.k.a** )
**MOCEAN ENERGY**, a U.K. company )
posing as a Maryland company; )
**CAMERON MCNATT**, as individual; )
**CHRIS RETZLER**, as individual; )

4

1  WAVE ENERGY CONVERSION

2  CORPORATION OF AMERICA, a

   former Maryland company;

3  BRIAN CUNNINGHAM, as individual;

4  DAVID KREAMER, as individual;

   EVAN YOUNG, as individual;

5  CHRISTOPHER PRICE, as individual;

6  JIM CLINTON, as individual;

   JOSEPH J. NEWBERGER, as individual;

7

8  MANHAR DHANAK, as individual;

9  MOHAMMAD REZA ALAM, as

   individual;

10 PAUL ROTGER, as individual;

11

   AQUAHARMONICS, a California

12 business;

13 ALEX HAGMULLER, as individual;

   MAX GINSBURG, as individual;

14 FREDERICK DRISCOLL, as individual;

15

   JEFF SCRUGGS, as individual (U of MI);

16 PEDRO LOMONACO, as individual;

17 DYLAN TEMPLE, as individual;

   SCOTT BEATTY, as individual;

18 ROBERT THESHER, as individual;

19

20 DOES 1-8

21

                Defendants.

22                                         5

1    The present action includes new claims and additional parties not included in an earlier

2    temporary filing (2019-178028-CZ) that was dismissed for lack of service on any of the

3    original parties within the original time allowed for service. Therefore, this prior action was

4    never allowed to advance and was <u>dismissed without prejudice</u>. The current action is a follow-

5    on of that now dismissed action and is independent of the earlier filing. The present claims

6    remain within MI statutes of limitations.

7

8

9    **Notes:**

10   - This is a complex case involving many defendants. This is the first amended compliant to

11   Plaintiff's prior (incomplete) complaint, originally filed on on Nov 15, 2022 (though not

12   certified until Nov. 17, 2022). It therefore relates back to the earlier filing date.

13   - A significant amount of additional information, facts, and evidence will await discovery,

14   since Plaintiff is not yet in possession of such additional evidence.

15   - This compliant incorporates less than 25% of pre-discovery information and material

16   available to Plaintiff (but due to space limitations more cannot be presented at this time).

17

18

19

20

21

22

6

**Description of Attachments**:

**Attachment 1:**

  Chart showing the organization of defendants, based on their affiliations and/or employers.

**Attachment 2:**

  Illustration of two methods that could have been employed to directly test and compare the

  performance of each device under *identical conditions*, in a very accurate, consistent,

  objective and fully transparent manner.

**Attachment 3:**

  Shows a page from the WEP website dated 10/02/2015, which is just prior to the 1/50th scale

testing of the AquaHarmonics (AH) device, in which the use of a winch is described as being

used as both a generator and a motor together with a a control system.

**Attachment 4:**

  Describes earlier research and evaluation of technology developed by the Atargis company

done in 2012. Atargis also entered the 2015 WEP competition with this same or similar device.

**Attachment 5:**

  Attempt to graphically illustrate and encapsulate the quite complex interplay and connections

between defendants named in this action. Note that most monies did not even go to to prime

contractors Ricardo Inc. And JZ Consulting, but instead went to pay for all the other expenses

involved in this event, including to universities for use of their wave tanks and possibly some

to the Navy as well for use of their facilities. This will be the basis for further discussion below.

**Attachment 6:**

Photos of the top-prize winning AquaHarmonics facilities and headquarters, one of its researchers at that facility and of Sandia Labs testing a device which appears to be very similar to the one AquaHarmonics entered, rather than any of the other entries.

**Attachment 7:**

This is a very important comparison of the size and dimension differences between each of the five tanks chosen to test various competitor devices, chosen to be their 1/50th scale models. Note should be made of their extreme dissimilarities and dimensions.

**Attachment 8:**

Plaintiff's initial proposal and request for both direct and exemplary damages. Support and justification to be provided at trial. Of course resolution of this matter would also be open to out-of-court negotiations and settlement as well.

## Terms Which May Be Used Interchangeably:

1. A Named Party / Defendant

2. WEP / Wave Energy Prize

3. WEC / Wave Energy Converter

4. Contest / Competition / Game of Skill

5. Lottery / Game of Chance

6. Luck / Chance / Gamble

7. Odds / Probability

8

8. Unfair / Rigged / Cheating

9. Advising / Consulting / Helping/ Assisting / Aiding

10. Measurement Metric / Judging Criterion

11. Proxy / Substitute / Approximation / Estimation / Formula / Predictor

12. Guess / Fudge Factor / Subjective Opinion

13. Objective / Robust / Scientific / Accurate / Precise

14. Reproducible / Unassailable / Uncontroversial / Peer Reviewed / Widely Accepted

15. Validated / Verified / Witnessed / Uncontested

16. Claim / Representation / Assertion / Prediction / Speculation

17. State of the Art / SOTA

18. Department of Energy / DOE

19. National Renewable Energy Lab / NREL

20. DOE's Inspector General / IG

## INTRODUCTION

**Overview of Allegations and Claims:**

1. In 2015 the DOE allocated $16+M in funding for the creation of an 18 month long competition aimed, at finding new and improved methods for capturing the large amounts of energy in ocean waves. It was titled the DOE 'Wave Energy Prize' (WEP) and was described and advertized both in the press and at a website set up for it (WaveEnergyPrize.org), by Ricardo Inc. and Polaris Strategic Communications, as a first of its kind ocean energy

9

conversion contest, awarding large prizes to the top three entries that could achieve *previously unheard of* increases in wave energy capture efficiency and/or comparable cost reductions. These prizes were $1.5M, $500K, and $250K. However, the contest also required that all competitors bear their own costs for competing throughout the majority of the contest (at least until they were chosen as finalists). Only 9 out of the original 92 entries made it to the finals stage, even though 10 were supposed to have been chosen (since two alternates were also chosen).

2. Ricardo Inc. and JZ Consulting LLC were awarded the contract to design and administer this competition along with staff from the Department of Energy (DOE), the National Renewable Energy Lab (NREL) and Sandia Labs. Both of the prime contractors have offices in Michigan and all other defendants named in this action served under their specific directions. Further assistance was provided by five U.S. universities and a number of outside consultants and academics, all named as defendants in this action, along with several of the competitors in this event, who for various reasons became *willing participants* in what Plaintiff now alleges was a fraudulently run competition that violated gaming and other laws in all 50 states.

3. Plaintiff became concerned that this was not a normal or legitimate way to run a contest and more specifically that those in charge of it were possibly engaged in a fraudulent enterprise, aimed at benefitting themselves and other organizations and individuals they were already well familiar with and had worked with in the past (i.e. cronies), more than they were in actually discovering new talent, knowledge or technology.

4. Plaintiff alleges that once the prime contractors were awarded the contract to run the

10

contest they didn't really care if they knew how to do this in a fair and legal way. They knew they would get the money anyway, because the rules made clear that none of their decisions about how to run it or how it would be judged could be challenged or appealed in any way and all decisions made by them, and them alone, were final.

5. Contestants didn't know how a contest should be run either, and they didn't care, because they just assumed the contest creators did know and had the full authority to run it any way they wanted to, and just assumed everything about it was all legal.

6. Plaintiff believes that the principal defendants responsible for proposing the contest, drafting its rules, methods used for testing, metrics used to quantify performance and cost and rank each contestant based on these *contrived* metrics, as well as their decision to judge the event behind closed doors, were all bogus and illegal acts subject to civil and potentially criminal adjudication.

7. Plaintiff alleges the above defendants used entirely fabricated, unsubstantiated, and unscientific methods for judging this high-stakes event that resulted in huge errors being made and also allowed large amounts of cheating to occur throughout all stages of the event.

8. Should Plaintiff's allegations be found to be even partially true, this would immediately invalidate the results of the 2016 contest and would to this day constitute a deliberate fraud and deliberate cover-up, designed to inflict ***continuing harm*** on both Plaintiff, other hard working and sacrificing contestants, and most of all, taxpayers.

9. The organized and well coordinated nature of this alleged fraud would also have then constituted a conspiracy to commit fraud, as well as a deliberate cover-up of the fraud

11

1  conspiracy, leading to additional charges of RICO fraud. Even if only one law had been

2  violated in Michigan (or in any other state), the entire contest would have been illegal and its

3  results invalid, and null and void.

4     10.  Plaintiff also alleges that various dubious and even illogical statements were allowed to

5  be made throughout this competition by those administering it, since at its conclusion everyone

6  involved appeared to claiming that major advances had been made in the field of wave energy

7  conversion. One big problem with this was that these purportedly *amazing results* were never

8  independently substantiated or verified by any outside reviewers or even outside observers.

9     11. Therefore, the rather bizarre assumptions and predictions made by Dr. LaBonte and

10  others at the DOE, may therefore have constituted a deliberately false and highly misleading

11  advertising and marketing campaign and promotional fraud (using the internet and phone

12  communications, in furtherance of the alleged scheme and fraud, thereby raising possible

13  questions of wire-fraud, as well).

14     12. The very complicated, and specially devised measurement and judging methods used

15  in this competition were also overly subjective, never previously vetted or independently tested,

16  and were never proven to be accurate or even valid at all, especially under real world

17  conditions (not to mention in wave tanks having different dimensions). These *new metrics* were

18  also never proven in any way to be useful or effective for comparing different wave energy

19  designs, much less accurate enough to be used in judging a very high stakes competition that

20  would cost the government and its taxpayers millions of dollars for both prizes, salaries and

21  profit margins for its contractors and subcontractors.

22

12

13. The above *new metrics* were never approved for scientific evaluation purposes by any officially recognized measurement-standards body, such as the National Bureau of Standards, prior to their being used in this contest for the *first and ONLY time*.

14. The principle level 1 and level 2 defendants must have known the huge and *long term consequences* of using such new and unproven metrics for judging a high-stakes contest, both in terms of its potential harm to the reputations of the many losers of the contest, along with the tremendous financial rewards that would befall *the winners* and that would extend far beyond the initial prizes.

15. Winning this contest conferred a great deal of prestige on the winning teams and companies and would have offered them a clear market advantage as well, with lots of free publicity as well (at least in the U.S.). It would also have made it much easier for them to win additional government support along with a much greater opportunity to attract private investments.

16. Plaintiff alleges that these specially devised *proxy metrics,* were intended to be used for this event alone and were never used in any prior scientific studies or competitions and will never be used again, by anyone, for any purpose, because Plaintiff intends to prove at trial, *beyond any doubt*, that they are scientifically and economically useless as proxies for accurate measurements of anything. For that reason it is being alleged they also have absolutely no value as *predictors* of larger scale (much less full-scale) real world performance or manufacturing costs, which was one of the stated purposes for having the competition.

17. Plaintiff further alleges these *special metrics* were designed to allow the judges and

13

administrators to *fudge & manipulate* results so as to steer them towards results they wanted

and intended to get, and which they all had predicted they could get, all along. How else could

they have known in advance that their desired results could be so easily achieved in just 18

months, and with the expenditure of so little money?

18. Many additional technical, scientific and legal transgressions are being alleged herein to

have been committed during this contest, and some will be further detailed below, but space

limitations do not permit describing them all, so much will have to be left for later exposition,

either during discovery or at trial. This includes detailing the quite complex interactions,

alleged collusion and cheating that took place between various groups of defendants. Plaintiff

respectfully requests that the court and eventual triers of fact and law, take this into account

when evaluating the sufficiency of the present complaint.

19. The facts and legal claims made herein will be proven by Plaintiff beyond any

reasonable doubt (much less beyond a preponderance of the evidence) and the suggested

remedies and levels of compensation sought by Plaintiff for Plaintiff's damages which are to

preliminarily to be asked of a jury to approve, will also be fully supported by comparative

analysis and relevant economic data.

20. Plaintiff is seeking justice in the hopes of being made at least as whole as is after 7

years, which would include making up for all of Plaintiff's lost personal, career and business

opportunities over the last 7-8 years, the loss of potentially exclusive sales of and control of, a

potentially *revolutionary* new (Michigan-invented) green energy technology, that could have a

possible future worth in the 10's of billions of dollars. which Plaintiff is alleging was

14

*deliberately sabotaged* or at least negligently and/or intentionally suppressed by the DOE, the NREL, the contest organizers, and all those who stood to benefit from maintaining the status quo in the upcoming and very likely lucrative new wave energy market, which eventually (in 20 - 40 years) could grow to become worth over <u>a trillion dollars per year</u>. If that would not provide an incentive and motive to cheat in a high-stakes competition to win some or all of such a huge new market, then Plaintiff does not know what would.

21. Plaintiff, Plaintiff's family, and Plaintiff's business(s), have all been severely harmed (for many years now), as a direct result of the decisions made and the deliberate actions taken by the many individual defendants herein named. They were all made in full cooperation with, coordination with, and allegiance too the principal defendants in this dispute, at the agency of which Dr. Ernest Moniz served as its director and so bore overall responsibility for (i.e the buck stopped with him).

## SCIENTIFIC BASICS BEHIND EVENT

22. While defendants are already very knowledgeable about the scientific and technical underpinnings of this dispute, it is in the interest of the adjudicators of this case to also gain at least a rudimentary understanding of what Plaintiff will be referring to in some portions complaint.

23. While the present complaint basically concerns the question of the legitimacy, honesty, fairness, transparency and legality of a competition between many differing technologies that

15

1    was intended to be aimed at finding the best new advances in harnessing ocean energy to then

2    be converted it to electricity, so as to provide an additional and completely new source of

3    renewable energy, it does not require detailed knowledge of these technologies. Nevertheless it

4    will be helpful to know some of the basic concepts behind what researchers are attempting to

5    do in an effort to provide a third major source of green energy.

6        24.  To begin with, ocean waves are produced by the wind, which in turn results from the

7    heat of the sun. Since waves can originate far from where they end up (usually starting on

8    eastern coasts), they can remain fairly constant in both duration and magnitude over very long

9    distances and periods of time, even though their wave heights and wave lengths can vary

10   significantly from one location to another and from day to day.

11       25. Nevertheless, ocean waves are typically much more reliable than local wind conditions

12   or requirements for sunny days. For this reason, it is a more attractive source of renewable

13   energy than the latter two are. Also because of this, ocean energy would not necessarily need to

14   be stored, compared to wind and solar energy.

15       26. Indeed, wave energy could operate 24/7 without any storage being required at all and

16   could also lessen the need for storage of solar and wind energy because of this advantage. In

17   that way, wave energy could therefore serve as a reserve or backup source of energy for wind

18   and solar energy, because it would be available to some extent 24/7 and more or less maybe

19   340-350 days of the year.

20       27. This explains the present interest in finding efficient, reliable, durable, and, most of all,

21   cost effective ways to capture this limitless source of renewable energy that doesn't require

22                                               16

00005

land and that if properly designed, would have minimal or no impact on the ocean and its environment and not cause any harm to its sea creatures.

28. It is sufficient for now to understand the two main aspects of ocean waves that determine the amount of energy they contain and therefore the maximum amount of energy that could be captured from them. It is impossible to capture all of this energy and indeed, to date, it has yet to be demonstrated that even half of this energy can be captured and converted to electrical energy, or even a third of that, under realistic conditions. Overall, only between 20% and maybe 30% of ocean energy has managed to be reliably captured and even that is highly dependent on many factors. In fact, as is very relevant to the present dispute, no one actually knows what the most efficient wave energy device is to date or how much energy it can produce, because that would require having access to data on over 100 current devices from all over the world, most of which have yet to release any hard data because that is still being kept as trade secret and proprietary.

29. Finally, without large wave energy devices being cost competitive with wind and solar energy, wave energy generators will never succeed commercially, even if one or more of them eventually technically successful.

30. Below is shown the two main factors affecting the energy and power in waves. Those are the wave height and wave period, or wavelength. The energy in a wave is proportional to its height squared as measured between its two peaks.

31. The time it takes for two peaks to be measured is called the wave period and the distance between peaks is called its wavelength. Since the speed of waves in medium to deep

17

00005

1    water is basically constant, the number of waves that pass by in a given period of time has no

2    effect on the energy delivered over that time because more waves over that same time means

3    each wave has a shorter wavelength and therefore carries less energy in each wave, but since

4    there are more of them in that same period of time their total energy over that time is the same.

5    However the maximum instantaneous force that a wave can exert on a structure, or a wave

6    energy device, can be greater with shorter wavelengths, since the shape of each wave is steeper.

7    Such waves can be very harmful to wave energy devices and are also known as *slamming*

8    *waves*. Those are the types of waves you encounter near shore and those that can cause so much

9    erosion of sea walls.

10



**Energy the Same Over Time (T) For Same Amplitude (in deep water)**

18    32. For well over a century already there have been hundreds of ideas proposed for

19    capturing the energy of ocean waves and converting it into electricity. Indeed the number of

20    ideas that have already been patented exceeds more than a thousand. The main categories of

21    devices are represented below:

22                            18

00006



From September 2016, Ocean Energy Magazine)

33. Among these basic types of devices are 5 main ones that typically operate passively, since they do not require any energy input to begin working or to be able to continue to working. These are:

- Attentuators

- Point Absorbers

- Oscillating Wave Columns

- Submerged Pressure Differential

- Oscillating Wave Surge Converters

19

Each of the above approaches can have many variations possible. Some examples of these are shown below:



25. Plaintiff's unorthodox (and unique) concept, which differs radically from those shown above (and in the past) is not pictured here, since it is the subject of numerous patent applications and has yet to be publicly demonstrated.

26. It had been planned to be introduced and demonstrated for the first time during the 2015-2016 competition, until Plaintiff had to withdraw from it from the competition, shortly after registration, when it was learned that it would not be allowed to function as designed (with all its components) and as required by Plaintiff.

1  ## FACTS AND ALLEGATIONS COMMON TO ALL COUNTS

2

3  **The Contest Promotion**

4    27. Some of the big advantages claimed for having such competitions, which Alison

5  LaBonte and the DOE were touting, are shown below in two DOE presentation slides.

6

 

12    28. It remains to be seen if any of these promotional claims were justified or if they actually

13  resulted in any of what was being so heavily hyped at the time. In particular, the bragging in the

14  first bullet point stating, *"Pay only for successes that meet ambitious prize goals"*, should be

15  noted. These are obviously very clear *contractual terms* that no DOE employee (including

16  Alison LaBonte) would ever be asked (much less expected and *demanded*) to be met, in order

17  to obtain a paycheck or compensation.

18    29. Another bullet point to be noted in the DOE's uber-optimistic and heavy promotional

19  efforts for the event, that was important for attracting participants, was *"Can mobilize more

20  investment than the prize purse"*. And in the first slide "This claim is especially important as it

21  relates to Plaintiff's later request for damages, since it confirms the huge financial benefits and

22

long term impacts that the DOE professed would (and did) result from winning a prestigious

government award and official recognition of achievement towards commercial viability of

wave energy capture, and the large amounts of follow-on funding and investor interest that has

now accompanied that.

30. All the more reason the contest needed to be legitimate and absolutely correct in its

findings, performance claims, cost estimates and predictions for the future, especially regarding

potential commercial success, which is of prime concern to private investors.

31. Plaintiff believes this scientific and legal debacle could have all been avoided had DOE

officials and especially Secretary Moniz, and Alison LaBonte insisted that the contractors

consult with attorneys specialized in gaming and contest law, as well as independent wave

energy experts, before finalizing any rules and procedure.

32. In the opinion of Plaintiff (one which may later be proven correct), neither lead

defendants Julie Zona or Wesley Scharmen were experts in law and they also appear to have

had little if any experience in running competitions, much less how to correctly design

scientific experiments that would stand up to scrutiny. Nevertheless and unfortunately, it was a

very consequential competition that had major implications for the future of wave energy,

especially the future of commercial wave energy.

33. Plaintiff also believes that the DOE funded contest could not have produced the results

that it did without the collusion of a substantial number of defendants along with the two

Michigan contractors awarded the contract to run the event for the U.S. government (i.e. its

taxpayers).

00005

34. Dr. LaBonte appears to have been especially enthusiastic about the benefits of having such a contest and in particular wanting to make the requirements for winning a prize, conditional on an entry's ability to attain a predefined *minimal level of performance*, not simply by outperforming other competing entries (as is the case in all other traditional competitions). Setting a <u>minimal performance bar</u> at more than twice what has ever been achieved before (anywhere in the world) is simply never done, because it requires <u>advance knowledge</u> of what is possible. By analogy, demanding that weight lifters press at least double the prior worldwide record in order to win a prize would be completely ludicrous and therefore would never be done. And yet this is what LaBonte wanted. Also, why would the unrealistic goals have been set at <u>exactly double</u> the supposed prior state-of-the-art performance level? Why not 1.5x better, or at least 1.2x times better?

35. Athletic competitions never set an arbitrarily high, predetermined, ***minimum level*** of achievement in order to win a prize. Legitimate competitions simply award those who outperform other competitors, regardless if any new records will be set. So why did the DOE's contest have this requirement?

36. Contrary to how competitions are typically run and judged, Alison LaBonte and her DOE colleagues felt confident that by simply setting requirements for winning a prize much higher than normal, they likely would be achieved, especially if they *demanded* they be achieved in order to win a prize. Something which of course no DOE employee (especially Alison LaBonte and Ernest Moniz) would never expect of themselves or *volunteer* to do in exchange for a prize, instead of a salary.

23

37. Defendant, LaBonte, also appears to have believed that those entering such competitions would be individuals and small companies who otherwise would have little chance of ever obtaining government funding by means of the normal grant application process and so they would be even more motivated (and/or desperate) to *at least try* to achieve what was being asked, because otherwise they would have little or no chance of ever getting any financial support at all.

38. Dr. LaBonte also appears to have been intrigued by the fact that only contestants that actually *'delivered the goods'* they liked (but without embarrassing or surprising anyone), would be awarded a prize, but those who failed, would get nothing, even to help pay for their significant expenses & labor, lasting up to 18 months (including in some cases weekends and holidays, in order to try to win a prize).

39. The amount of labor, financial resources and personal sacrifices that were involved in trying to achieve the scientifically unrealistic goals needed to win a prize, was clearly of no concern to the DOE and its *well paid staff* (that included Alison LaBonte) or to the NREL, Ricardo Inc., J.Z. Consulting, Julie Zona, Wesley Scharmen, and dozens of other defendants named in this complaint (as well as several as yet unknown, 'DOES').

40. Plaintiff alleges defendants didn't care because the people they were trying to attract were individuals and small companies who had little or no other chance of ever getting government support, much less publicity about their work.

41. Alison LaBonte, in particular, stated and believed that there were some people who just 'loved to solve problems', whether they got paid for it or not. Apparently, such people could be

24

encouraged and induced to work for the government and take *their orders*, but still remain happy and even enthusiastic while doing so, by just giving them *the hope* of winning a prize.

42. Best of all for the government and the DOE, most of these enthusiastic *volunteer problem solvers* would never have to be paid anything for their valuable work, which then could be used by the DOE in the future (or just ignored or discarded since it cost relatively little to get).

43. This approach of offering prizes in exchange for otherwise very costly research that could take many years to complete by salaried government researchers, should just be called the 'Only Pay For What You Like' method of <u>doing research on the cheap</u>.

44. However, LaBonte's interpretation of the above concept went even farther, by raising the bar for winning a prize so high that at least to any casual observer, it should have seemed likely that no one could have ended up winning a prize.

45. Unfortunately when helping to draft the rules for this contest, LaBonte failed to realize that not awarding any prizes at its conclusion, would probably have been illegal in every state.

46. Plaintiff also believes that at no time did Alison LaBonte or any of the other organizers, administrators and judges being paid by the DOE, ever consult with any lawyers, especially any having knowledge of gaming and contest laws.

47. Indeed, in some states, contests that contain any elements of chance at all (regardless of how small) are simply prohibited. There are also one or two states that have Constitutions prohibiting games involving even small amounts of chance or luck. And, unless expressly permitted by each state's legislatures, games involving anything but a very tiny amount of

25

00005

1   chance are deemed to be lotteries, or a form of gambling, and therefore are just illegal in those

2   states.

3      48.  There is no state in the U.S. that allows contests or games that contain any significant

4   amount of chance or luck or ones where the chances of winning or losing depend heavily on

5   subjective decisions or that are not transparent to contestants and the public, or which cannot

6   be challenged or appealed, even to determine if fraud was involved.

7      49.  This competition should have been overseen by then U.S. Secretary of Energy, Dr.

8   Ernest Moniz, as well as other high level DOE officials. Even after the contest began, had any

9   serious problems been found at any stage in the event, the contest could have simply been

10  cancelled or delayed until a later date, when all conditions and rules for competition could have

11  been approved by attorneys.

12     50.  The decision to forgo consultation with attorneys prior to launching such a high-stakes

13  and prestigious competition, exemplified the arrogant self-confidence of defendants Alison

14  LaBonte, Julie Zona, Wesley Scharmen and many of their colleagues at the DOE, the NREL,

15  and Sandia Labs. They all had a self-interest in ensuring that the competition would proceed as

16  planned, regardless of any legal or scientific issues being raised about its legitimacy.

17     51.  Perhaps as scientists and engineers, the contest organizers felt that laws did not apply to

18  scientifically judged competitions and therefore that no legal problems could possibly arise.

19  Instead it appears they may have felt that common sense would be sufficient to devise the

20  contest's rules and specially invented metrics, along with new and *creative* approaches for

21  evaluating, comparing and ranking very different technologies. What problems could possibly

22

1    arise with such thinking by PhD's?

2        52. Nevertheless, had the DOE and Dr. Moniz required the contest designers to consult

3    with attorneys before even beginning to draft the rules for the competition, they would have

4    quickly been advised that their plans would likely have been illegal in all 50 states.

5        53. The competition goals were supposed to have been achieved by means of a very

6    scientific and objectively conducted 18 month competition, but one which also would

7    ultimately cost participants anywhere from thousands of dollars to 10's of thousands of dollars

8    as time went on (and in a few instances much more than even that). This in exchange for an

9    exceedingly small chance of winning any prizes.

10        54. In some cases even a win of $250,000 might barely have covered expenses. Plaintiff

11    believes this is no way to exploit talented and educated people, and derive material benefits

12    from their free labor, especially if they are also being cheated and defrauded in the process.

13        55. Attachment 5 attempts to encapsulate how many of the defendants in this complaint,

14    allegedly cooperated with and colluded with each other, along with potentially several

15    participating teams, in a deliberate fraud conspiracy merely being *disguised* as a legitimate

16    competition but which was alleged to have been both an illegal lottery (in its beginning phases)

17    and then just a rigged contest towards the end.

18        56. By any stretch of imagination, this event could not have been called a fair and legal

19    *game of skill* or legitimate contest, which would have required considerable knowledge,

20    education, experience, skill, creativity and expertise in the fields of wave energy conversion,

21    fluid mechanics, physics, mathematics, computer simulations, design of experiments,

22    27

1    prototyping, economics, and some knowledge of intellectual property matters (all of which

2    Plaintiff possesses).

3    57. Any competition that claims to be one based on skill and scientific/technical

4    achievement (as to opposed to a lottery, or game of chance), must abide by strict legal and

5    scientific methods of evaluation and transparent decision making.

6    58. The reason for clearly distinguishing between legitimate *contests of skill*, and other types

7    of games, including lotteries, and sweepstakes, is that the latter types do not require any

8    knowledge, ability or expertise in order to have a chance to win a prize and because they just

9    rely on chance and luck, which legal *contests of skill* cannot.

10    59. In the U.S. and all of its states, no legitimate contest of skill can include chance (to any

11    measurable amount) and so must predominately or exclusively be determined by skill,

12    throughout. In contests relying solely on a participant's superior skill or other objective

13    criterion, results are usually determined without any human involvement at all (such as in the

14    case of athletic competitions).

15    60. The results of the DOE's contest, should therefore have been entirely determined

16    independent of subjective human judgement, opinions, estimations, educated guesses, fudging

17    of numbers, or use of proxies in place of actual accurate, transparent and observable

18    measurements of results. Contests must be free from any biases, much less malfeasance, in

19    order to be legal in any of the 50 states.

20    61. While the DOE's WEP contest should have been very easy to objectively and fairly

21    judge, Plaintiff alleges that it was in fact the exact opposite of this, and that instead it became a

22

28

1    total scientific and legal debacle, which Plaintiff also alleges resulted in fraud being committed

2    against most contest participants, and Plaintiff in particular, but not until the DOE actually

3    transferred funds to the declared winners of the competition.

4        62. Until the official transfer of taxpayer provided prize money, it could have been seen and

5    claimed to have simply been an *unintentional debacle* that could have been admitted and

6    apologized for at any time prior to the actual transfer of any prize money to the winners.

7        63. Instead, Plaintiff is alleging that those responsible for the event and its judging, simply

8    chose to cover up what happened and proceeded to announce winners and transfer large

9    amounts of prize money to them, perhaps in the hopes no one would ever learn what really

10   happened and the results would just be accepted and later quickly forgotten, allowing the DOE

11   to go back to business as usual and continue funding those it had been funding in the past. No

12   major funding changes would have to be made, regardless of who supposedly won or lost the

13   WEP contest devoted to finding the newest and best technologies in America..

14       64. One particularly egregious example of alleged conflict of interest and collusion concerns

15   consultant/participant/defendant Mirko Previsic and those he had extensive prior connections

16   with at the DOE, the NREL, Sandia Labs, in addition to some possible contest judges.

17       65. Plaintiff alleges that Mirko Previsic was consulting directly or indirectly for the DOE,

18   the NREL and potentially others before and during the contest, as well as being heavily

19   involved with at least one other entry in the contest and possibly two other entries which should

20   not have been allowed. It is further alleged that he was paid for all his consulting work and that

21   none of the help he may have been providing to others was done for free.

22                                                     29

00005

66. Plaintiff therefore alleges that Previsic sought to capitalize as much as possible from this contest, in any way he thought he could. This included consulting for various other participants as well as entering the contest on his own (having no other team members) and also being a member of at least one other team (something not allowed in legitimate competitions). Mr. Previsic owns the company Re-Vision Consulting that had received funding either directly or indirectly from the DOE, even prior to this event and also following it. Therefore Previsic's relationship with many of the defendants named herein, is being alleged by Plaintiff to have been founded on classic cronyism as depicted below.

**EXAMPLE OF COMPLEX CONNECTIONS, INTERACTIONS AND CONFLICTS OF INTEREST**



By the end of the *originally specified* deadline for registration (July 15, 2015), 32 contestants had already been officially accepted and more would likely have registered by that time

00016

1  (including Plaintiff), had it not been extended at the last minute.

2      67. But this would have also altered the initial odds of winning a prize (that was legally

3  required to be posted but was not), would have been at most $[1 - (31/32)*(30/31)*(29/30)]$, or

4  approximately 9%-10% (assuming all things being equal, including skill levels).

5      68. But after extending the time to register (without asking approval from any of the early

6  registrants), 92 teams had signed up to compete. There were no good reasons provided for

7  doing this, except to increase the appearance of interest in the event, since even if only 20-30

8  teams had been entered, that would have been sufficient to have a successful contest, especially

9  if they could have then all competed in a single (identical) large tank, rather than several tanks

10 having vastly different dimensions, characteristics and capabilities, as shown in Attachment 7.

11 But then, instead of having to allow most of the 92 registered teams to actually test in wave

12 tanks, Plaintiff alleges that the organizers wanted a way to justify immediately eliminating 72

13 of these new contestants, without having to let almost any of them go any further.

14     69. Of course this decision also resulted in dramatically changing the odds of winning a

15 prize from 10% to only 3%. This was one of the first extremely unfair things that Plaintiff

16 noticed as a result of extending the registration deadline. Plaintiff has rarely heard of this

17 happening in other competitions. To Plaintiff's knowledge, this is not allowed in most contests

18 that advertise a specific registration deadline. However this was just the first of many

19 deceptive, misleading, unfair and allegedly fraudulent stages of the event (and unfortunately it

20 was only a harbinger of things to come).

21     70. In the lead up to the event, competitors were told to expect to spend their time and

22                                 31

efforts pursuing a goal that was actually (in all likelihood) impossible to achieve in such a short amount of time, especially with little if anything in resources with which to accomplish this extremely ambitious goal.

71. It was no wonder then that most of those who originally signed up were quickly eliminated for reasons which were never revealed to anyone but likely had at least something to do with this lack of resources, more so than lack of inventive talent.

72. The stated technical goals of this contest were also quite ludicrous, since the metric they proposed and used to help disqualify competitors had never been used before anywhere and was never before published before for vetting by experts.

73. These *special* or *proxy* metrics have never been endorsed for use in the evaluation or judging of wave energy devices, especially in the context of an extremely high-stakes contest. This is because even after 8 years there is still no way to actually predict or even come close to predicting the full scale performance (much less eventual cost) of any new wave energy device.

74. Even attempting to come up with a reasonable estimation of both these critically important factors for commercial success, requires the expenditure of a huge amount of time, the use of sophisticated mathematical models and analysis and now computer modeling (sometimes requiring costly supercomputers), along with actual wave tank, or ocean testing.

75. This analysis can often take many months to years complete and can cost hundreds of thousands of dollars, for each new device. Obviously, this could not (and was not) able to be done in an 18 month competition having 92 different devices to evaluate, so it is also clear that the event should have had much more modest goals from the start. To claim that the prime

32

1  contractors were able to do all this was simply absurd and basically a lie told to both the public

2  and the press.

3      76. Plaintiff therefore is alleging that this also constituted false and intentionally

4  deceptive advertising and promotion. The contest organizers knew this very well, but

5  nevertheless claimed that they could do it, using their *newly invented* metrics and *overly*

6  *simplistic* approach to estimating costs.

7      77. Plaintiff further alleges that the DOE, NREL and Sandia Labs, used this contest as an

8  experimental vehicle to prove they could make accurate predictions of future outcomes, using

9  these new metrics, that they believed to be far superior to conventional metrics used in all other

10  studies. This meant that all competitors were ranked using these scientifically unproven, as yet

11  untested, and dubious (future) predictions of device capabilities, rather than any actual full

12  scale or even half-scale testing of these machines, either in very large wave tanks or real world

13  testing in the ocean.

14      78. Those organizers and contest administrators who agreed to continue in this event,

15  despite having had to at least been suspect that the contest was not going to be a fair one and

16  potentially even a fraudulent one, cannot now say they were not aware of this possibility.

17      79. Therefore, Plaintiff believes that those participants who chose to remain in the

18  competition and who have now been named as defendants in this action, were knowingly

19  complicit in not only the fraud alleged to have been committed, but also its intentional cover-

20  up by reason of having agreed to remain quiet about any concerns or knowledge they may have

21  had of possible wrongdoing. They did not even attempt to disclose what they knew was going

22

1   on, to higher-ups.

2   80. In contrast to this alleged negligence (if not gross negligence), Plaintiff attempted

3   several times to communicate his concerns, including directly to Energy Secretary Moniz and

4   later on to the Inspector General of the DOE. There were simply to many irregularities and

5   scientific and legal mistakes being made throughout this event, for more people than just

6   Plaintiff to not have been aware of them.

7   81. The above has lead Plaintiff to believe that Alison LaBonte knew such a contest might

8   not be legitimate and would not comport with how such contests should be run, already when

9   she and others at the DOE, NREL and Sandia Labs proposed having one to supposedly

10   discover the latest and greatest in new wave energy generation innovations.

11   82. Plaintiff believes it was just a bonus for the DOE, that by deliberately cutting corners,

12   oversimplifying things, making bold assumptions and predetermined decisions, based on very

13   unconventional, unusual, and easily manipulated judging methods and standards, it was also

14   good for the DOE's bottom line, as well as its desire to get more publicity and awareness for its

15   work in the wave energy field. The contest was obviously very profitable for both Ricardo Inc.

16   and JZ Consulting, along with numerous other defendants (not to mention the declared winners

17   of the event).

18   83. Therefore, if one does the math, such competitions and government-funded *challenges*

19   appear to be clever ways to *get science done on the cheap*, because most of the time, labor and

20   materials costs, are bore by the competitors themselves, not the government.

21

22   34

**Basic concept of a *fair contest*:**

84. Below is a representation of how Plaintiff and common law might graphically illustrate the difference between the DOE's WEP contest and a typical, fairly judged, and completely legal *contest of skill*, based on objective and easily measured levels of performance, skill and overall merit (athletic or any other skill or talent).

85. This is depicted below as a simple series of progressively higher and more difficult to clear hurtles that must be passed in order to finally win a contest and a prize, with the determination of something like speed, distance, lifting ability, swimming ability, tennis ability, chess ability, etc., being judged by independent judges, not involved in either the design or administration of the competition, or its rule making.



**DOE 'Contest'**

**Normal & Legitimate Contest**

86. This progression of heights and degree of difficulty would almost always be somewhat gradual and consistent in one direction only, namely higher and more difficult to clear as a

35

00017

1    contest progressed and with contestants being gradually eliminated if more than one test was

2    involved.

3        87. In addition, the performance of each contestant would be able to easily be confirmed and

4    agreed upon by either experts, or ordinary, non-expert observers rather than decided by a group

5    of judges selected by the same individuals chosen to host the contest and design it. Also such

6    decisions would not be made behind closed doors, as was the case in the DOE's WEP contest

7    (especially once testing had to be done at a restricted Navy facility).

8        88. Particular note should be made of the first three *hurtles* of the DOE contest:

9    registration, extended registration, then eligibility vetting. Each of these should have at least

10   been slightly more difficult to clear for each team but which, instead, appeared to be trivial to

11   pass, with no real eligibility or qualification vetting having taken place at all.

12       89. In essence, all those registering to enter appeared to have been deemed both eligible and

13   qualified to compete, including a few teams that were being <u>lead by</u> seemingly random

14   Americans with no backgrounds in STEM at all, much less in wave energy science (with one

15   foreign team being considered eligible because it was lead by an American *car rental agent*).

16       90. As a result, all 92 registrants, were allowed to continue on to the technical information

17   submission stage of contest, despite many of them not being able to satisfy even the most basic

18   technical information requirements and others not being eligible to even enter the contest due

19   to their being foreign companies merely trying to masquerade as legitimate American entries.

20       91. The next hurtle would normally have included technical vetting of each device that

21   again would normally have allowed a large number or majority of entries to proceed to actual

22                                              36

1    wave tank testing.

2        92. However in the case of the DOE contest, almost all entries were immediately

3    disqualified either as a result of not submitting technical disclosures on time, or as a result of

4    closed door decisions that were never explained (at least not publicly) and could not be

5    questioned or appealed.

6        93. Indeed over 70 of the originally accepted entries (i.e. > 78% ) were summarily

7    disqualified without ever being allowed even one actual tank test.

8        94. Normally at least 3/4 of entries might have been allowed to go on to a tank test, after a

9    fair technical evaluation process and Plaintiff believes most of the 92 initially accepted entries

10    should have been allowed to test, since there could be no other way of knowing in advance of

11    that which technologies might prove better than others, especially in the case of Plaintiff's very

12    unorthodox device (and probably at least 50 others).

13        95. This large number of disqualifications were therefore planned in advance and intentional

14    and likely made solely for the purpose of reducing the number of entries remaining to exactly

15    20, so as not to have to actually test all devices (which would have cost contractors or the DOE

16    much more and taken perhaps an additional year to test).

17        96. The contest organizers knew in advance that no matter how many entries they might

18    get, they would only have enough time and funding to test 20 devices. In a legitimate contest

19    every qualified entry would be allowed to test and no limit would be placed on their number,

20    since this could not be done by any fair, unbiased and objective process, especially when

21    dealing with new technologies that may never have been tested before, so that their

22                         37

00018

1    performances might have been able to at least have been estimated with reasonable accuracy

2    (i.e. +/- 10%).

3    97. Attachment 2 illustrates two very simple and easy ways to implement methods for

4    measurement of power and/or the electrical generating capability of wave energy devices, in

5    away that can be easily implemented, understood and verified by anyone, including lay people,

6    when explained what to observe.

7    98. The two direct methods shown also allow viewing and displaying results immediately

8    for anyone to witness and confirm, without the need for complicated and error-prone

9    calculations, simplistic and inaccurate computer modeling, or backroom decision making

10    reliant on many subjective and biased considerations other than just direct measurement of

11    energy output.

12    99. Very questionable pseudo-economic analysis would also never play a role in purely

13    performance-based testing, which would be conducted under identical test conditions and only

14    in a single tank, or at least in identical testing facilities that would be allowed to be observed

15    and verified by any other competitors, experts, or members of the public. Unfortunately, there

16    are no identical wave tanks in America.

17    100.  Instead of this fairly simple and direct method of comparing devices to determine

18    which would outperform the other, the contest organizers not only wanted to measure the

19    energy produced by each device based on their dimensions, but they also wanted to be able to

20    *predict* how such devices would perform when at their full commercial scale (which might not

21    even have been known yet) and also how much they probably would cost when scaled to

22

00018

commercial size.

101. Worse yet, the very suspect and very crude cost estimates (and/or guesses) were then used as the denominator of one of their metrics. To show how much worse it is to multiply or divide one poorly estimated metric into another poorly estimated metric, the following simple example may help.

102. If you add two numbers that should each be 1, but are both estimated to be 0.5 so they have been incorrectly estimated to be half their correct values, then compare that result to the multiplication of the two incorrect values, the difference in the calculated value compared to the actual value should will be $0.5 + 0.5 = 1$ for addition and $0.5 \times 0.5 = 0.25$ for multiplication. The addition would be half the correct result (2), while the multiplication (or division) of those incorrectly estimated values would be one quarter (0.25) of the correct result (1). Therefore the multiplication or division of two badly estimated values can be far worse than their addition.

103. There was a great deal of multiplication and division involved in the specially *invented metrics* used for judging this contest, as can be seen in the definitions for two of them, shown below. The metrics used in this contest were used **before** they had even been proven to be valid, accurate and reliable. The complexity of one of them can be seen on the right, below.

39

### The ACE Metric



The Prize has selected ___ as a proxy for LCOE for comparing low Technology Readiness Level WEC concepts.

## ACE = ACCW/ CCE

Average Climate Capture Width (ACCW) = The absorbed power of the device (kW) divided by the wave energy flux per meter crest width in kW/m

Characteristic Capital Expenditure (CCE) = Total Surface Area (m²) x Representative Structural Thickness (m) x Density of Materials (kg/m³) x Cost of Manufactured Material per unit Mass ($/kg) for all applicable materials.



### Hydrodynamic Performance Quality (HPQ)

- ACE is a reduced-content metric that relates average climate capture width and characteristic capital expenditure
- HPQ modifies ACE to account for further WEC device characteristics that will be ultimately important to LCOE and can be quantified during 1/20th scale testing program at MASK. These include:
  - Watch circle
  - Mooring force
  - Absorbed power ratio of peak to average
  - End-stop impacts
  - Absorbed power in realistic seas
  - Adaptive control effort

$$HPQ = ACE \times (WC_{HPQ} \times MF_{HPQ} \times AP_{HPQ} \times ES_{HPQ} \times RS_{HPQ} \times AC_{HPQ})$$



**THE PARTIES**

104. Below are shown several of the defendants who had a lead or key role in the design and judging of the competition (however not all judges are shown or known at this time):

## WAVE ENERGY PRIZE
## PANELISTS







**Moderator:**
Allison LaBonte, PhD.
U.S. Department of Energy
Program Manager

Jochem Weber, PhD.
National Renewable Energy Laboratory
Technical Expert

Phil Michael
Ricardo, Inc.
Technical Expert

Stephen Elser
Naval Surface Warfare Center
Carderock Division
Testing & Evaluation

Julia Zosa
JZ Consulting
Prize Administrator







WAVE ENERGY PRIZE
U.S. DEPARTMENT OF ENERGY

1    105. A number of additional partners, contractor employees, and other collaborators in this

2    event are shown below. All have been named as defendants in this complaint.



Wave Energy Prize photo taken at National Renewable Energy Laboratory during TG4 – back row, Scott Jenne (NREL), Wesley Scharmen (Ricardo), Rick Driscoll (NREL), Julie Zona (JZ Consulting), Scott Beatty (Cascadia Coast), Alison LaBonte (DOE), Darshan Karwat (DOE), Budi Gunawan (SNL); front row, Stephanie Hodge (DOE), Bob Thresher (NREL), Vince Neary (SNL), Phil Michael (Ricardo), Jochem Weber (NREL), Annie Dallman (SNL), David Newborn (NSWC), Lee Jay Fingersh (NREL)

**PLAINTIFF**

16    106. **Plaintiff George Sachs** founded Paradyme Systems USA in 1982 (originally called

18    Paradigm Systems), shortly after graduating from college with degrees in applied math and

19    physics. Its purpose was to provide math, computer, scientific, engineering and computer

20    related consulting services on a confidential and *ultra-secure* basis, to both small and large

21    companies seeking this kind of service.

22                                        41

**DEFENDANTS:**

107. **Principal Defendant Ricardo Inc./Ricardo PLC** is a corporation maintaining offices in Michigan, at 40000 Ricardo Dr, Van Buren Charter Township, 48111. Ricardo's business comprises consulting and manufacturing services mainly targeting the automotive and more traditional energy markets. Ricardo has no particular or extensive expertise in the field of wave energy and to Plaintiff's knowledge has never done any research in the field.

108. **Defendant Wesley Scharmen** is an employee of Ricardo Inc. and was the lead for the WEP contest. Scharmen is a resident of Michigan.

109. **Defendant Philip Michael** was also employed by Ricardo Inc. and assisted Wesley Scharmen with the competition. Michael now resides and does consulting work in North Carolina.

110. **Defendant JZ Consulting LLC** was contracted to oversee and manage the competition in accordance with rules and eligibility requirements prescribed in the Federal Register. JZ Consulting LLC operates in Michigan.

111. **Defendant Julie Zona** is the owner of JZ Consulting LLC, a Michigan company with an office in Julie Zona's Michigan home.

112. **Defendant Polaris Strategic Communications LLC** was the company chosen by prime contractors Ricardo Inc. and JZ Consulting to provide media services and promotional efforts for the WEP contest. At the time of the contest they were located at 7145 Lake Drive, Warrenton, Virginia. However they no longer appear to be in business now. No other website or location for this company seems to exist now. It is also unusual that they used the '.org'

42

00018

extension for their site, since this is normally reserved for either non-profit organizations, or academic websites. Why the DOE and the prime contractors would not have noticed and asked about this is not known.

113. **Defendant Christine Fuentes** was the owner of Polaris Strategic Communications LLC and appears to still reside in Virginia at this time.

114. **Defendant Ernest J. Moniz** was former Energy Secretary at the Department of Energy (DOE) in 2015-2016 and, therefore, had full oversight responsibility for this competition. He currently is a resident of Massachusetts and now CEO of the Nuclear Threat Initiative.

115. **Defendant Alison LaBonte** was the principal lead for the Department of Energy (DOE) 'Wave Energy Prize'. She is no longer employed by the DOE and works for the California Public Service Commission. LaBonte is a resident of California.

116. **Defendant Jose Zayas** was director of the Wind Energy Technologies Office at the U.S. Department of Energy and before that was director of DOE's Wind and Water Power Technologies Office. He was heavily involved in the design and conduct of the contest but is no longer with the DOE either. It should be noted that his prior background & training was in the field of wind energy rather than wave energy and it does not appear that he is still involved in the wave energy field, either. After the DOE, Zayas became VP of partnerships and strategic initiatives at Cube Hydro Partners in Bethesda, Maryland but has now become VP of the American Counsel on Renewable Energy. Zayas is a resident of Virginia.

117. **Defendant Darshan Karwat** was employed by the DOE during the period of the

43

1    competition but is now employed as a professor at Arizona State University and resides there

2    part time and in Ann Arbor, Michigan..

3        118. **Defendant Stephanie Hodge** is Senior Management Analyst for the DOE, and to the

4    best of Plaintiff's knowledge resides in Colorado. Her background and expertise, if any, in the

5    field of wave energy generation is presently unknown. She is a resident of Colorado.

6        119. **Defendant Pamela Brodie** is a Grants Management Specialist for the DOE and to the

7    best of Plaintiff's knowledge lives in Denver Colorado and is a resident of that state. Her prior

8    experience with wave energy research grants is unknown.

9        120. **Defendant Gary Nowakowski** was a Project Management Supervisor at the DOE. He

10   is a resident of Colorado.

11       121. **Defendant The Stevens Institute of Technology** is a private research university in

12   Hoboken, NJ. They offer undergraduate and graduate programs in the sciences, and technology.

13       122. **Defendant Lee Fingersh** is an electrical engineer at the National Renewable Energy

14   Laboratory (NREL) and is a resident of Colorado.

15       123. **Defendant Scott Jenne** works in the Strategic Energy Analysis Center at NREL in

16   Golden, Colorado.

17       124. **Defendant Jochem Weber** is Chief Engineer at the NREL's Water Power Program,

18   and is a resident of Colorado.

19       125. **Defendant Frederick Driscoll** is a Senior Engineer for the NREL in Golden,

20   Colorado.

21       126. **Defendant Re-Vision LLC**, is a consulting company owned by Mirko Previsic, an

22                                                44

1    individual well known to the DOE, the NREL and the judges of this contest, some of whom

2    had also worked with Previsic before and after the contest ended. The company is located in

3    Sacramento California and the company submitted one of its own entries in the contest, under

4    the name 'Next Gen'. This entry did poorly in the contest, despite Previsic being considered an

5    expert in the field of wave energy by the DOE.

6        127. **Defendant Mirko Previsic** resides in California. While consulting for the NREL, the

7    DOE, and others, Mr. Previsic appears to have also been involved in the WEP prize contest

8    design and was well known to several of the judges of the contest. In addition to his own

9    contest entry he was also named the leader of at least one ineligible foreign entry that wound up

10   being declared the third place winner of the contest. He also appears to have done consulting

11   work for others in the contest, without being declared an official team member, which would

12   not have been allowed. Despite Previsic's alleged misconduct and cheating, he continues to

13   receive financial support and grants from the DOE.

14       128. **Defendant Charles Maher** was a team leader for the AWP/AWS company, another

15   ineligible foreign entry. He was a resident of Connecticut but his current address needs to be

16   confirmed. Since other team members were not U.S. residents or citizens, Mahar is their only

17   representative subject to U.S. jurisdiction and liability.

18       129. **Defendant WaveSwing America** was also not an eligible U.S. entry, since it had no

19   actual offices in the U.S. In truth the 'WaveSwing America' entry was actually a Scottish

20   technology developed entirely in Scotland and having nothing to do with U.S. entities. Mirko

21   Previsic posed as their team leader and merely provided them with a fake appearance of being a

22                                                45

00024

1   legitimate U.S. based company. In essence, WaveSwing America was merely a thinly disguised

2   *front company* for the Scottish WaveSwing company, which was not eligible to enter under

3   Federal Register rules. Nevertheless, apparently due to Mirko Previsic's involvement and

4   connections with the DOE, NREL and contest judges, this ineligible foreign company ended up

5   winning 3rd place in the competition. In addition, Mirko Previsic continues to receive grants

6   and financial support from the DOE and the NREL and continues to work closely with one or

7   more of contest organizers, contest judges and DOE employees. Mirko Previsic's address will

8   be used as the address for Wave Energy America as well.

9      130. **Defendant NextGen** was Mirko Previsic's and Re-Vision's official entry in the

10  contest. Both are located in California, though it is not known if NextGen still exists.

11  Apparently Mirko Previsic was its only team member. As mentioned above, for reasons

12  unknown, Previsic's entry did especially poorly in the contest, despite the DOE, the NREL and

13  their employees, considering Previsic to be an expert in the field of wave energy. Prevesic

14  continues to receive funding from the government to this day, even long after the contest

15  ended. NextGen's address will be assumed to be that of Re-Vision in California.

16     131. **Defendant IOwec** was entered into the competition by an Italian company, merely

17  disguising itself as an American entry by teaming with MIT and MIT's Sea Grant Program, in

18  order to appear to be an American entry. This technology was in fact based on Plaintiff's

19  original and pioneering concept for wave energy capture, first conceived of in the 1970s and

20  later refined and patented by Plaintiff in 1982. Newer, more advanced, versions of the

21  technology are now patent pending with its commercialization having been planned to coincide

22                                      46

1    with the conclusion the 2016 competition and Plaintiff's expected big win in the contest, 40

2    years after Plaintiff's original invention of the technology. Plaintiff is alleging the IOwec entry

3    was merely a knock-off of Plaintiff's original and seminal *American-invented* technology and

4    Plaintiff's decades long R&D of the technology, to its present state.

5        132. Plaintiff is alleging that defendants wanted to  pretend that the GyroGen(TM) and

6    IOwec entries were essentially the same technology. Following elimination from the finals

7    stage of the contest, IOwec no longer has any presence in the U.S. and appears not to have any

8    further interactions with MIT or its Sea Grant Program either. Since the names of the

9    approximately 20 Italian students who assisted the IOwec/MIT team remain unknown and are

10    assumed to still live outside U.S. jurisdiction, they have not been named as defendants or even

11    'DOES' in this action, since that would serve no legal purpose.

12        133. **Defendant Michael Triantafyllou** is an MIT professor and director of the above

13    cited Sea Grant Program. He is believed to still be a resident of Massachusetts.

14        134. **Defendant Stefano Brizzolara** was Assistant Director for Research at the MIT Sea

15    Grant Program. He is now a professor of Virginia Tech. and resident of Virginia.

16        135. **Defendant Manhar Dhanak** is Director of the Institute for Ocean and Systems

17    Engineering at Florida.

18        136. **Defendant Reza Alam** (full name Mohammad-Reza Alam) is a professor at the

19    University of California, Berkeley and resides in California.

20        137. **Defendant Paul Rotger** was listed as lead of the Etymol Ocean Energy entry and his

21    background and qualifications were listed as being a Sales Associate at Enterprise Rental Car.

22        47

1   He appears to have been the only U.S. resident of this team living in the U.S. at that time.

2   Based on his lack of even basic qualifications, Mr. Rotger appears to have only served as a

3   means for an otherwise ineligible foreign company to gain entrance into a competition that was

4   specifically reserved for U.S. resident companies and individuals only, as clearly stipulated in

5   the Federal Register. Paul Rotger's location is presently unknown.

6      138. **Defendant AquaHarmonics** is a California business owned and operated by Alex

7   Hagmuller & Max Ginsberg, both citizens of California. Prior to winning the competition, it

8   does not appear that AquaHarmonics was a formal company or a registered business and did

9   not have a business email address or website. They operated in their spare time from a small,

10  unfinished one-car garage, having little or no resources available to them. They were

11  competing against some entries that had years of research and work experience and in some

12  cases millions of dollars in backing, including from the DOE and the NREL. Plaintiff is of the

13  belief that their having been declared first place winners of the competition - by a long shot -

14  raises serious questions that need to be answered, since the AquaHarmonics team had almost

15  no resources at all, and did not posses the scientific knowledge needed to win such contest (if

16  legitimate). For that reason, Plaintiff is of the belief that this entry may have served as just a

17  front Sandia Labs, who were not allowed to enter the contest themselves.

18     139. **Defendant Alex Hagmuller** is co-wner of AquaHarmonics & resident of CA.

19     140. **Defendant Max Ginsburg** is co-owner of AquaHarmonics & resident of CA.

20     141. **Defendant Sandia National Laboratories** is now a subsidiary of Honeywell

21  International Inc., having previously been owned by the Lockheed Martin Corporation. Both

22  48

1    Honeywell and Lockheed are therefore also liable for any violations of law committed by their

2    past or present subsidiary, Sandia Labs. Sandia Labs is located in Albuquerque, NM.

3         142. **Defendant Lockheed Martin** is a Maryland corporation that was the former owner of

4    Sandia Labs at the time the contest was held by the DOE.

5         143. **Defendant Honeywell International** is a North Carolina conglomerate whose U.S.

6    corporate offices and officers for some reason seem to be intentionally difficult to locate. For

7    the purposes of this litigation the Plaintiff will use the address in Charlotte, NC.

8         144. **Defendant CalWave** is a California wave energy company and 2nd prize winner.

9         145. **Defendant Marcus Lehmann** is a California resident.

10        146. **Defendant M3 Wave** is a Oregon wave energy company. It's owner's Mike Morrow

11   will be used as its mailing address since no other address can be found..

12        147. **Defendant Mike Morrow** is a resident of Oregon.

13        148. **Defendant Atargis** is a Colorado wave energy company.

14        149. **Defendant Stefan Siegel** is a resident of Colorado.

15        150. **Defendant Oscilla Power** is a Seattle, Washington wave energy company.

16        151. **Defendant Tim Mundon** is a resident of Washington.

17        152. **Defendant Balakrishnan Nair** is a resident of Utah.

18        153. **Defendant Jennifer Vining** was a Senior Electrical Design Engineer at Oscilla

19   Power, Inc., which was a competitor in the competition, while she was also heavily involved in

20   many aspects of the contest. She now works for the Nikola Corporation, headquartered in the

21   state of Arizona. See is a resident of Seattle, Washington.

22                                          49

00025

1.     154. **Defendant Rahul Shendure** is believed to still be a resident of Seattle, Washington.

2.     155. **Defendant RTI Wave Power** is a Miane wave energy company.

3.     156. **Defendant John Rohrer** is believed to still be a resident of Maine.

4.     157. **Defendant Dick K. P.Yue** is believed to still be a resident of Maine.

5.     158. **Defendant Yuming Liu** is believed to still be a resident of Maine.

6.     159. **Defendant Sean Lewis** is believed to still be a resident of Maine.

7.     160. **Defendant Sea Potential** is believed to still be a Rhode Island wave energy company.

8.     161. **Defendant Tim MacDonald** is believed to still be a resident of Rhode Island.

9.     162. **Defendant Paul Brewster** may now have returned to Ireland but this needs to be

10. confirmed..

11.     163. **Defendant SEWEC** is a California wave energy company.

12.     164. **Defendant Nick Wynn** is believed to still be a resident of California.

13.     165. **Defendant Byron Barnes** is believed to still be a resident of California.

14.     166. **Defendant Carol Bennett** is believed to still be a resident of California.

15.     167. **Defendant Tom Benson** is believed to still be a resident of California.

16.     168. **Defendant Casey Birmingham** is believed to still be a resident of California.

17.     169. **Defendant Nicholas Gray** is believed to still be a resident of California.

18.     170. **Defendant Sean Lavelle** is believed to still be a resident of California.

19.     171. **Defendant Harvest Wave Energy** was an entry in the DOE contest, but its present

20. status and that of its team members DOES 1-5, is unknown.

21.     172. **Defendant WaveSwing America** was claimed to have been a California company but

22.

1    no longer seems to exist. Mirko Previsic was its only member.

2        173. **Defendant James Gose** is believed to still be a resident of Michigan.

3        174. **Defendant Kevin Maki** is believed to still be a resident of Michigan.

4        175. **Defendant Troy Lyons** is believed to still be a resident of Iowa.

5        176. **Defendant Curtis Libby** is believed to still be a resident of Maine.

6        177. **Defendant Anthony Viselli** is believed to still be a resident of Maine.

7        178. **Defendant Vincent Neary** Was at Sandia Labs in Colorado at the time of the contest

8    but his address is currently in Tennessee.

9        179. **Defendant Ann Dallman** is believed to still be a resident of New Mexico.

10        180. **Defendant Budi Gunawan** is believed to still be a resident of New Mexico.

11        181. **Defendant Diana Bull** is believed to still be a resident of New Mexico.

12        182. **Defendant Kelly Ruehl** is believed to still be a resident of New Mexico.

13        183. **Defendant McNatt Ocean Energy a.k.a. Mocean** is a UK company.

14        184. **Defendant Cameron McNatt** is a UK citizen but his current residency is unknown.

15        185. **Defendant Chris Retzler** is a UK citizen but his location is presently unknown.

16        186. **Defendant Wave Energy Conversion Corporation of America** is a Maryland

17    company.

18        187. **Defendant Brian Cunningham** is believed to still be a resident of Maryland.

19        188. **Defendant David Kreamer** is now a professor of engineering at the University of

20    Nevada.

21        189. **Defendant Evan Young** is believed to still be a resident of Maryland.

22                               51

190. **Defendant Christopher Price** is believed to still be a resident of Maryland.

191. **Defendant Jim Clinton** is believed to still be a resident of Maryland.

192. **Defendant Joseph J. Newberger** is believed to still be a resident of Maryland.

193. **Defendant Jeff Scruggs** is believed to still be a resident of Michigan.

194. **Defendant Pedro Lomonaco** address is unknown at this time.

195. **Defendant Dylan Temple** address is unknown at this time.

## JURISDICTION

196. Defendant and DOE prime contractor Ricardo Inc. has offices in Michigan along with defendant and DOE prime contractor JZ Consulting LLC.

197. Since the nexus of all alleged actionable violations of state and federal law that Plaintiff alleges occurred during the period 2015-2016, were committed within the state of Michigan.

198. Since the responsibility for the alleged violations of these laws falls primarily on defendants Ricardo Inc. and JZ Consulting LLC,, and because Plaintiff is also a resident of Michigan, Michigan is proper for both personal and subject matter jurisdiction over all defendants named in this action, since all defendants carried out (to the letter) all instructions given to them by these two prime contractors, without objection or refusal to do so, even though it is being alleged that they either knew all along of serious problems with the contest, or became aware of them at some point during the event.

52

00025

199. These problems were both of a scientific and legal nature and would not have needed even a college degree to easily recognize and be concerned about.

200. Defendants who are not residents of the state of Michigan would nevertheless be subject to full Michigan jurisdiction, since Ricardo Inc. and JZ Consulting LLC were each the prime contractors for the DOE and where responsible for all oversight and decision making throughout the 18 month duration of the event and all defendants willingly complied with their instructions, deadlines, technical decisions, rulings and judging methods.

201. This made all defendants either one of *unpaid agents* or *paid assistants/employees* of the prime contractors for the duration of the event. If any defendants refused to follow the instructions and *orders* given to them, they would have been fired or eliminated from further competition and thereby have faced loss of income and/or the loss of an opportunity to win a large prize, that would have also been needed to cover the large costs of just entering the contest (as well as the loss of potentially very lucrative future government grants and future private investments). This is something almost no one who had anything to do with this contest wanted to risk.

202. In an email sent to Plaintiff, defendant Julie Zona made it very clear that she was the person responsible (i.e. the 'boss') when it came to all final decision making, even when it came to technical, scientific or legal matters, all of which she would have been entirely unqualified to make (on her own), but she appears to have done so anyway. No actions could be taken by any of the named defendants, without the express approval of Ricardo Inc. and/or JZ Consulting and no one would be paid without an official approval coming from Michigan.

00025

1    This then clearly establishes that, Michigan, served as *the nexus* of all actions resulting in the

2    damages being claimed herein, and as is shown in Attachment 1.

3      203. All non-resident defendants named in this complaint, therefore, effectively served as

4    *defacto* subcontractors to Ricardo Inc. and JZ Consulting, during the duration of the contest.

5    Those defendants entitled to be paid for their services during the contest, were paid by Ricardo

6    Inc., or at least required the authorization of payment by these two Michigan based contractors.

7      204. The 6th Circuit Court of Michigan, therefore, has proper personal and subject matter

8    jurisdiction over all defendants named in this complaint and all other as yet unidentified

9    defendants, as allowed for under the long-arm provisions of statute MI ST 600.705 (2003).

10    Both personal & subject matter jurisdiction properly resides with Michigan, given the evidence

11    and arguments presented.

12

13                              **VENUE**

14

15      205. Plaintiff believes that (as best is possible to determine given such a large number of

16    defendants) Oakland County Circuit Court would offer the best possible Michigan venue in

17    which to adjudicate this matter. Proximity also seems to be proper and best, given some of the

18    Michigan defendants live west of Detroit, Wayne County and Oakland county, and Plaintiff

19    lives in Oakland County.

20

21

22                         54

00025

# TYPES OF CONTESTS

206. A **LOTTERY** (or game of chance) is defined in all 50 states as comprising 3 elements:

> (a) A *Prize*: One or more of which must be awarded.

> (b) A *Consideration*: Which can be anything of material or tangible value, including labor, valuable data, proprietary information, cash or in kind contributions, materials, or equipment usage, that are needed to enter the contest or must be paid during it.

> (c) *Chance*: Winning or losing a prize is entirely dependent on chance, not skill or something that is under the control of participants.

207. A **SWEEPSTAKES** is similar to a lottery, no skill involved, but typically no payment or purchase is necessary.

208. A **GAME OF SKILL** (or just 'contest') is defined as a game where chance plays no role where almost anyone (even non-experts) can agree on who the winners are. So a contest consists of:

> (a) A *Prize*: One or more of which must be 'winnable' and awarded.

> (b) A *Consideration*: Which can be anything of material or tangible value, including labor, valuable data, proprietary information, cash or in kind contributions, materials, or equipment usage, that are needed to enter the contest or must be paid during it.

> (c) *Pure Skill*: No chance or luck involved & easy to verify results and agree on them.

209. There is little question that at least in most states, including Michigan, the DOE's contest would at least in it's initial stages, have been considered to have been a lottery (and therefore an illegal lottery under MCL 432.1, et seq.), since only a very limited number of participants had any control over whether or not they would be allowed to actually test or just be immediately eliminated.

**Qualifications of contest administrators:**

210. Ricardo's Wesley Scharmen, had little or no experience as a wave energy researcher or expert and appears to have had no specific education or training in the field either. This is consistent with Ricardo Inc. being primarily an automotive related manufacturing company, rather than a green energy company. It also appears that Wesley Scharmen had no educational background or formal training in economics, especially as it relates to the success or failure of new and nascent technologies. This applies to all others involved in contest as well. However, that did not stop defendants from engaging in their own economic theories and speculation, for the purposes of this competition.

211. Similarly, Julie Zona had one prior experience overseeing a contest prior to the DOE event. Her prior background was almost entirely automotive related and she had no education, training or experience in the field of wave energy and the complex issues involved in that and so she may have just simpified them to an extent that made her very ineffective and even grossly negligent and incompetent as a contest leader..

212. Via depositions and/or at trial it is expected to be confirmed that both prime

56

1    contractors, Julie Zona, and Wesley Scharmen were entirely ill equipped to objectively, fairly

2    and legitimately conduct such a complex, prestigious, high-stakes, and highly consequential,

3    competition and that Alison LaBonte must have been aware of this but has not yet admited it.

4        213.  There has yet to be an acceptable scientific explanation for why an alternate new set of

5    *untested metrics* were thought to be necessary for judging this competition, when that was not

6    necessary at all to accurately compare and judge any entry, regardless of how it was made to

7    operate (see Attachment 2). The focus on costs is also very perplexing, since there is yet no

8    way to predict which new technologies might have the greatest chance of commercial success,

9    regardless of cost (although it is more important in the energy field).

10

11                    **CAUSES OF ACTION APPLICABLE TO ALL DEFENDANTS**

12

13       214.  The common elements and allegations of the present complaint involve questions

14    about what the various defendants knew and when they knew it. It is being alleged that at some

15    point in time (to be determined in discovery or at trial) most if not all defendants must have

16    realized that the competition was seriously flawed or even rigged and, therefore, could not be

17    judged and decided fairly. They also must have known that many participants were being

18    arbitrarily and capriciously eliminated for reasons not based on rigorous and fair scientific

19    evaluation and testing (under identical conditions), which is a must for any valid experimentat,

20    much less a high-stakes competition.

21       215. Plaintiff alleges that the few remaining participants in the semi-finals and finals testing

22                                                   57

00034

1   phases (which were far fewer than those who entered the contest) must have known that the

2   contest was plagued with serious technical and scientific issues and biases. Even common

3   sense and simple logic as to what constituted a fair and objective contest, would have lead to

4   the conclusion that this event was not fair at all & indeed, any (ethical) high school science

5   student would have realized this as well.

6       216. Plaintiff maintains that is not hard to identify a fair contest from an unfair one and that

7   this one should have been recognized as an unfair one from the beginning (since Plaintiff

8   certainly became suspicious within its very first stages). Why so many others, including

9   Secretary Moniz and those in his office did not, remains a mystery that needs to be explored

10  further in discovery or at trial.

11      217. Even without including the many scientific and technical deficiencies and the serious

12  errors in judgements, along with the total lack of ethics, evidenced throughout this

13  competitiont, Plaintiff is of the belief that sufficient knowledge and facts required to credibly

14  assert that numerous violations of Michigan law were made,and that many of these same

15  violations of law were also made in other states as well.

16      218. It is required by law that any contest that could potentially be determined to be illegal

17  in that state, must be clearly identified as such and prohibited from being offered in that state .

18  The contest organizers apparently didn't care about this requirement and proceeded to just

19  ignore it, without consulting with any attorneys about that.

20      219. Those who felt, knew, or should have known that the contest was not being run in a

21  fair, objective or legal manner had a legal and ethical obligation to inform someone of this, file

22                                          58

1  a formal complaint, or simply resign from the event, especially since a significant amount of

2  taxpayer money was involved that could have been put to much better use. Instead it appears

3  that the desire to win a large prize overrode the better judgement of many participants,

4  especially those receiving a salary or compensation for their help in it. Nothing can excuse

5  continuing to participate in a fraudulent contest, especially one that could constitute a

6  conspiracy as well. Realizing that this contest was unfair or rigged, didn't even require an

7  engineering or science degree, just simple common sense.

8

9  **FIRST CAUSE OF ACTION**

10  **CIVIL RICO 18 U.S.C. § 1962 (c,d)**

11  (Against Ricardo Inc., JZ Consulting, Sandia Labs, Polaris Comm., DOE employees, et al.)

12  220. Plaintiff re-alleges and incorporates by reference herein each and every allegation

13  contained herein above as though fully set forth and brought in this cause of action.

14  221. State courts have original jurisdiction to enforce the Civil RICO statute, 18 U.S.C.

15  1964. See Tafflin v. Levitt and Lou v. Belzberg, Rice v. Janovich and Village at Camelback v.

16  Carr.

17  222. Typically two RICO "predicate acts" are required to have been committed within a 10-

18  year period, see 18 U.S.C. 1961. The federal statute at 18 U.S.C. 1961 itemizes all RICO

19  predicate acts, the most common being mail fraud, extortion, obstruction of justice, obstruction

20  of a criminal investigation, and witness tampering or retaliation.

21  223. Violations of State and federal laws both qualify as RICO *predicate acts* and 18 U.S.C.

22

00034

1961 provides long list of federal offenses that qualify as predicate acts. Any act or threat gambling, arson, robbery, bribery, extortion, etc., is also a RICO predicate act, if it is chargeable under State law and punishable by imprisonment for more than one year. See 18 U.S.C. 1961(a).

224. Civil RICO authorizes and allows for triple damages to be awarded to successful private plaintiffs. See 18 U.S.C. 1964(c).

225. Plaintiff is claiming, herein, that without the active <u>cooperation and collusion</u> of several agencies of government, their employees, along with numerous other entities, parties, and individuals, herein named as defendants, the following illegal acts could not have taken place in the state of Michigan and all other U.S. states, without the collusion & cooperation of many defendants named herein, who are to be determined in discovery and at trial:

- Operation of an illegal lottery in the state of Michigan and 49 other U.S. states.
- Fraud and deliberate cover-up of a fraud
- Contest rigging or tampering with a contest claiming to be one of *skill and ability*.
- Fraudulent misrepresentation
- Fraudulent concealment
- Potential obstruction of justice

And other violations of law, which at Plaintiff believes to be true (to the best ability of Plaintiff to determine at this time).

226. Plaintiff is further claiming that none of these acts could have successfully committed

60

1  and then covered-up without an intent to do so, at least by a majority of those being accused of

2  doing so.

3      227. Even more specifically, Plaintiff is claiming that (for the purposes of determining

4  Statute of Limitations) that the above listed *predicate crimes* only became legally actionable,

5  after payment of winnings were officially made. Prior to that point in time, they could have

6  avoided the present action, by simply cancelling their <u>soon to become</u> *illegal contest* (once

7  payment of taxpayer money was made). They could have then simply claimed that the event

8  was an unfortunate and unintentional case of 'incompetence' rather than fraud (i.e. *otherwise*

9  *known as a debacle*).

10      228. Plaintiff believes sufficient evidence exists to prove conspiracy and fraud in

11  connection with both the design and outcome of the Department of Energy's (DOE) contest

12  and that the various claims made by the principal defendants while promoting the event (using

13  the internet) were not credible and instead were intended to deliberately mislead and defraud all

14  participants in this contest, not just Plaintiff, for ulterior and selfish motives.

15      229. Despite having been billed as a rigorous, science-based, contest intended to find new

16  advancements in the field of wave energy capture, very little in the way of new scientific and

17  technical breakthroughs were demonstrated, since all winning entries were already known and

18  even previously funded by either the DOE or foreign countries. Indeed, most participants were

19  quickly eliminated before even being allowed to test their concepts in actual wave tanks.

20

21

22

00034

## **SECOND CAUSE OF ACTION**

### **FRAUD**

(Against All Defendants Provably Involved, Subject to Further Discovery)

230. Plaintiff re-alleges and incorporates by reference herein each and every allegation contained above, as though fully set forth and brought in this cause of action.

231. Because the competition in question was so poorly designed and executed and it's goals would normally have been unattainable, it was only possible to achieve them by cheating and using specially devised rating metrics for use only in this contest.in favor of certain specific technologies. One of those preferred technologies having been the AquaHarmonics device from California, which won top prize. This will be proven by a preponderance of the evidence.

232. The *specially fabricated* metrics used to rate and rank each device were so complex and biased, that no one (especially the competitors) could understand or validate them and these metrics could also produce huge errors and could be easily manipulated to achieve almost any desired result.

233. The most basic elements of good experimental design were simply ignored in this contest and exceptions to the rules were made for certain entries (such as totally ineligible foreign companies), that allowed an Italian (IOwec) company to claim credit for and compete against the originator and 'father of' of the *breakthrough* technology they were attempting to claim was their own concept. MIT knew this was not true, but said nothing and did nothing.

234. In violation of Federal Register rules, a number of foreign companies were allowed to enter their devices into the contest, by either masquerading as American companies and

1　American 'teams' by partnering with one or more American citizens or residents, or with

2　various universities, for the sole purpose of entering the event.

3　　235.  The contest organizers <u>deliberately made the first stage of tank testing much more</u>

4　<u>difficult</u> for some entries (such as Plaintiff's), than for others and therefore more difficult than

5　the last stage (an ordering of difficulty that should not have made). This is because some

6　devices required the use of components that were not allowed by a revised and altered set of

7　rules, not appearing in their original draft form. In all other contests, later stages are always

8　more difficult than earlier ones. Why others could not see this inverted order of difficulty,

9　Plaintiff does not yet know.

10　　236.  It is also being alleged that certain teams received special help and treatment, while the

11　vast majority of others got no help, especially those destined for early elimination.

12

13

14

15　**THIRD CAUSE OF ACTION**

16　**AIDING AND ABETTING**

17　(Against All Defendants Provably Involved)

18　　237.  Plaintiff re-alleges and incorporates by reference herein each and every allegation

19　contained herein above as though fully set forth and brought in this cause of action.

20　　238.  Because of the large number of defendants that potentially would be subject to this

21　claim and the fact that each would require a lengthy discussion of the facts pertaining to each,

22

1  Plaintiff respectfully requests that such facts and evidence either be allowed to be presented

2  following discovery, by means of later amendment, in the context of a pre-trial hearing, or left

3  until trial. Plaintiff is of belief and knowledge that sufficient facts as well as at least

4  circumstantial evidence exists to justify the above claim as applicable to at least a subset of

5  named defendants.

6

7

8

9  **FOURTH CAUSE OF ACTION**

10  **GROSS NEGLIGENCE**

11  (Against All Defendants Provably Involved)

12  239. Plaintiff re-alleges and incorporates by reference herein each and every allegation

13  contained herein above as though fully set forth and brought in this cause of action.

14  240.Because of the large number of defendants that potentially would be subject to this

15  claim and the fact that each would require a lengthy discussion of the facts pertaining to each,

16  Plaintiff respectfully requests that such facts and evidence either be allowed to be presented

17  following discovery, by means of later amendment, in the context of a pre-trial hearing, or left

18  until trial. Plaintiff is of belief and knowledge that sufficient facts (as well as additional

19  circumstantial evidence) exists to justify the above claim as applicable to at least a subset of

20  named defendants.

21

22

64

00048

1

## FIFTH CAUSE OF ACTION

2

### BREACH OF CONTRACT

3

(Against all level 1 and 2 Defendants Provably Involved)

4     241. Plaintiff alleges and incorporates by reference each and every above allegation as

5     though fully set forth and brought in this cause of action.

6     242. Plaintiff claims that the DOE WEP contest was indeed a written contract since

7     competitors had to sign a written agreement as to what they would commit to doing during and

8     abide by during the event, which meant that they had to commit to spending whatever time and

9     money necessary to pursue a very difficult, if not impossible to (fairly) win prize, unless they

10    chose to withdraw or risk elimination.

11    243. It was also taken for granted, and safe for contestants to have assumed, that the

12    agreement they were made to sign meant that the event was legal and that it would be legal in

13    all 50 states where the contest was being offered (because at that time how could this not have

14    been the case).

15    244. Contestants also had to assume that judging of the event would be conducted in a

16    scientifically rigorous, transparent, unbiased, fair, accurate and totally objective way, free from

17    subjectivity, manipulation of results, and above all free from incompetent oversight,

18    mismanagement, cheating, gross negligence, and especially fraud.

19    245. Contestants had a right to safely assume that all these things would be true and that the

20    agreement they entered into, in writing, would establish the fair contractual terms between of

21    the contestants and the contest organizers.

22                                         65

## SIXTH CAUSE OF ACTION

## BREACH OF IMPLIED CONTRACT

(Against All Defendants Provably Involved)

246. Plaintiff re-alleges and incorporates by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

247. It is obvious to Plaintiff that in the context of a competition demanding knowledge, experience and skill, pertaining to ones area of expertise, those organizing and holding such a competition are implicitly agreeing and committing to abide by certain common law and common sense obligations and expectations, in addition to all applicable laws, in every one of the 50 U.S. states, as well as all applicable federal laws.

248. Plaintiff intends to prove by a preponderance of the evidence that the competitors completely lived up to their end of the contest-bargain but the contest organizers, administrators and judges entirely failed to live up to theirs, and did not even have the courage to admit this to anyone, much less those who had entered this extremely long, extremely difficult and extremely expensive competition, which included Plaintiff.

249. As a registered contestant, Plaintiff did everything possible to ensure that the competition would be carried out in a fair and lawful manner, which included making efforts to contact then Secretary of Energy, Dr. Moniz, to discuss various issues and problems Plaintiff had observed with the event, but other than a very late response from Jose Zayas, who is not an attorney, no direct communication with Moniz ever occurred and Zayas' response was simply to deny that any problems existed and to state that the contest fully complied with the law and

66

1    the Federal Register announcement (even though it did not).

2    250. Plaintiff then went so far as to file a complaint with the DOE's (interim) Inspector

3    General, but was never informed of the outcome of that investigation, which appeared to not

4    have been very aggressively pursued and in which the NREL dragged its feet for many weeks,

5    when it came to answering questions about the event. It also does not appear that any outside

6    experts in either wave energy or contest law, were ever consulted.

7

8

9    <u>**SEVENTH CAUSE OF ACTION**</u>

10    **OPERATION OF AN ILLEGAL LOTTERY**

     (Against All Defendants Provably Involved)

11

12    251. Plaintiff re-alleges and incorporates by reference herein each and every allegation

13    contained herein above as though fully set forth and brought in this cause of action.

14    252. As described above, any contest or competition which in addition to awarding prizes

15    also requires a consideration (something of value) and also contains an element of chance, is

16    considered by almost every state in the U.S. to be a lottery, which in every state automatically

17    makes it an illegal lottery.

18    253. There are many ways to demonstrate that for the majority of participants in this

19    contest, it became little more than a <u>very expensive</u> lottery for them, since so many decisions

20    where based on subjective determinations made behind closed doors, using all manner of

21    dubious rationales that could not even be subject to outside review or appeal and which

22

67

1   essentially allowed decisions to be made in this way almost capriciously and at random. This

2   intentionally <u>denied the majority of entries</u> any ability to demonstrate the capabilities of their

3   devices, much less have an opportunity to win a prize with them. These often baseless, biased,

4   unjustified and/or arbitrary and random decisions clearly defined a contest where chance

5   predominated in at least its initial stages and were contestants had absolutely no control over

6   the outcomes of these initial decisions. This is the precise definition of a lottery, which in all

7   states, including Michigan would constitute and illegal lottery.

8

9

10

11   **EIGHTH CAUSE OF ACTION**

12   **CONTEST RIGGING**

13   (Against Level 1 & 2 Defendants Provably Involved)

14   254. Plaintiff re-alleges and incorporates by reference herein each and every allegation

15   contained herein above as though fully set forth and brought in this cause of action.

16   Plaintiff is of belief and preliminary knowledge that this competition had been designed for

17   the specific purpose of achieving *preordained* results for the DOE, mainly for the purpose of

18   public relations, publicity and to justify (mostly unsuccessful) research it had already been

19   conducting and funding for many years. Plaintiff is herein claiming that little if anything truly

20   significant or even new came out of what Plaintiff believes was both a fake and a rigged

21   competition, that favored those entries (or technologies) that the DOE, the NREL and

22   68

especially Sandia Labs were already well familiar with, but simply pretended to be surprised

about. Contest officials also admitted that they had not previously known about some of the

technologies. But neither those entries were eliminated almost immediately, or didn't win any

prizes and even make into the finals. And due to the DOE, NREL and Sandia Labs learning a

great deal about them even in the initial stages of the contest, this likely harmed their chances

of getting strong IP protections on their entries (which the DOE was not concerned about and

therefore never advised any of the competitors about, including the top prize winning

AquaHarmonics team).

## NINTH CAUSE OF ACTION

### FRAUDULENT MISREPRESENTATION
(Against Level 1 & 2 Defendants and Sandia Labs)

255. Plaintiff re-alleges and incorporates by reference herein each and every allegation

contained herein above as though fully set forth and brought in this cause of action.

256. Plaintiff is alleging and intends to prove that all promotional efforts and claims made

by the organizers and administrators of this contest involved deliberately false and misleading

statements, especially in regards to how the contest would be conducted and how winners were

going to be *fairly* tested and decided.

257. Almost nothing about their statements were true and many if not all of those

responsible for running and judging the competition knew they were deliberately misleading

69

1 prospective participants from the very beginning of the event, so as to get as many entries as

2 possible, which would be good for the PR and publicity efforts of the DOE.

3    258. In particular the alleged bogus claims of being able to greatly increasing the chances

4 for commercial success were not true, given the relatively short duration of this event,

5 compared to the length of time that would actually take to be able do this.

6    259. The organizers' claims of greatly being able to improve and greatly exceed the then

7 *state-of-the-art* performance and cost of other wave energy devices was not true (since they

8 could not even have known what this was).

9    260. The organizers' claims that their newly-invented *proxy* metrics were better for judging

10 small devices, was not true. Their claim that they method of estimating the cost of devices,

11 including full scale commercial devices was (absurdly) false.

12    261.  It now merely remains for Plaintiff to detail the role that each defendant may have

13 played in the fraudulent misrepresentations that are herein alleged in this complaint.

14

15

16                    **TENTH CAUSE OF ACTION**

17                    **FRAUDULENT CONCEALMENT**

18                (Against Level 1 & 2 Defendants Provably Involved)

19    262.  Plaintiff re-alleges and incorporates by reference herein each and every allegation

20 contained herein above as though fully set forth and brought in this cause of action.

21    263.  Below is just one example of the many roadblocks Plaintiff encountered while trying

22                                70

to investigate and gather evidence that could show some of the many errors made during this event, which upon actual payment of prize monies, Plaintiff is alleging constituted deliberate fraud, and gross negligence, rather than mere incompetence or simple negligence.

264. While some pages of the Ricardo's WEP website are still retrievable, most have now been removed from Ricardo's servers. However Plaintiff has copies of at least some of these and others should be recoverable from backups in discovery or by subpoena of the court.

265. Similarly, many of the pages of the DOE's website are now off limits to the public and require special authorization to access. Why this is, is unknown at this time.

266. There is, however, more than one instance of the contest administrators together with Polaris Strategic Communications attempting to hide or destroy evidence involving potential negligence and/or fraud. In one such case *someone* overwrote an important but apparently *problematic* web page with another totally unrelated one but then forgot to also change the web page descriptor after doing so (leaving clear fingerprints behind). Fortunately Plaintiff may have retained a copy of this page shortly after it was posted but this is still being searched for.

267. Some other now intentionally removed or deleted documents, articles and web pages were able to be retrieved from internet archives (which would not have been possible a decade ago) but many have not, since Ricardo Inc. Has made it impossible to access the original Wave Energy Prize website (waveenergyprize.org).

268. Defendants must be held accountable if they intentionally and maliciously acted to cover-up a fraud, or tamper with evidence to avoid prosecution, which in this case harmed many individuals and companies in addition to Plaintiff and Plaintiff's businesses.

71

00048

## ELEVENTH CAUSE OF ACTION

## UNFAIR BUSINESS PRACTICES

(Against All Defendants Provably Involved)

269. Plaintiff re-alleges and incorporates by reference, herein, each and every allegation contained above, as though fully set forth and brought in this cause of action.

270. Plaintiff is of knowledge and belief that defendants have engaged in unlawful, unfair, deceptive and allegedly fraudulent business practices, which included the creation of an allegedly *faux* or at least seriously flawed competition that knowingly discriminated against certain participating teams, companies and individuals (in particular Plaintiff's) in such a way as to prevent them from having a fair opportunity to demonstrate the capabilities and potentials of their technologies.

271. By doing what has now been alleged defendants agreed to do, en masse, they intentionally, and maliciously deprived most participating individuals, teams, businesses and companies, (particularly Plaintiff) of the opportunity to attempt to fairly win a very prestigious and valuable cash prize, along with the publicity and future financial and reputational benefits that would have also accompanied such a win..

272. Such alleged practices and illegal acts by defendants, if proven true, would also have deprived certain parties and specifically Plaintiff, from the opportunity to much more quickly commercialize their technologies, which if successful, would have greatly increased their value, especially since Plaintiff's *breakthrough* technology was already on the brink of commercialization and could have received a great deal of attention and publicity had been

72

00048

1   allowed to be introduced and showcase in this prestigious DOE contest.

2

3                       **TWELVETH CAUSE OF ACTION**

4                           **UNFAIR COMPETITION**

5                       (Against All Defendants Provably Involved)

6

7       273. Plaintiff re-alleges and incorporates by reference herein each and every allegation

8   contained herein above as though fully set forth and brought in this cause of action.

9       274. The alleged intentional prevention of Plaintiff's device from being able to be

10  appropriately evaluated in first phase of tank testing (because intentional, unreasonable and

11  unjustifiable limitations were to be imposed on it) that were not part of later stages in the

12  contest, was completely unfair, unnecessarily and discriminatory to certain technologies such as

13  Plaintiff's. This was also *completely antithetical* to the stated goals of the competition, which

14  did not state or advertise that only certain types of devices would be allowed to compete or be

15  tested in an actual wave tank.

16      275. There was absolutely no sense in requiring that more advanced devices be ***devolved***

17  into much more primitive and earlier versions of themselves, which would have obviously

18  casued them to perform much more poorly without those more advanced features (such a

19  electronic controllers and special algorithms).

20      276. In particular, Plaintiff's GyroGen(TM) entry could not function at all with its internal

21  components completely disabled, as was being required by the *revised contest rules*.

22                                      73

00048

277. As stated previously, the above serves as evidence Julie Zona did not understand how Plaintiff's device (and therefore IOwec's device) actually worked, or that contest organizers had not planned for this type of (advanced) device to enter the contest. This would also have implied that Julie Zona and other experts at the DOE didn't realize the two technologies were essentially identical, or they knew this but simply wanted to find a way to eliminate only Plaintiff's entry, while allowing the IOwec/MIT entry to proceed.

278. Requiring that smaller scale devices would only be allowed to test after essentially being stripped of their most important, advanced and innovative features, made no sense at all, because one of the requirements in a *fair contest* is that if there is more than a one test, then the earlier test(s) must be at least somewhat easier than later ones, so as to allow the better performing entries to easily and fairly stand out.

279. In addition, only the most simplistic thinking could come to believe it would be easier for a device to pass an initial test if it was stripped of the elements, and components, it needed to function as designed and which some other devices might not even require.

280. The goals of any fair competition is not to ensure competitors equity in results, just the fairness in deciding which competitor legitimately had the best results. Anything else would require cheating.

281. Apparently, it did not occur to the staff of the DOE, the NREL and Sandia Labs that if some devices were effectively *neutered*, while others were not, that would not be equitable or fair at all, since in some cases (such as Plaintiff's) it would mean that the stripped down device would perform much more poorly, or not work at all (as in Plaintiff's case). For such heavily

74

00048

redacted, retrograded and *mutilated* devices, the first hurtle in the competition would have been

effectively and unjustly made *infinitely high*, while the second and last hurtle needed to win a

prize (and allowed reintroduction of components removed in the first test) would actually

become much easier to clear (for entries such as Plaintiff's), for reasons which make no sense

at all.

282. By Julie Zona and others having stated that she did not call for the actual elimination of

Plaintiff's technology before any tank testing took place, is somewhat analogous to saying that

by merely removing the engine from a specially built race car, and thereby greatly reducing its

weight, it would make the car even easier to accelerate. This is the type of logic that not only

Plaintiff had to attempt to deal with, but many other participants did as well.

283. Because of these types of decisions and the lack of logic behind them, Plaintiff was

forced to withdraw from this important and prestigious competition, which could have had

huge consequences for the future of Plaintiff's technology and allowed its much more rapid

commercial introduction, which apparently the DOE, or at least some of its employees did not

want, despite the advertised goals of the event.

284. The only way to have run a truly fair contest designed to discovery the best wave

energy technology to date, was to have placed no restrictions on any of the entries and to have

just compared their energy inputs and outputs as directly as possible, '*mano a mano*' style, as in

Ford vs. Ferrari.

285. The DOE's allegedly fake and fraudulent competition, not only set the field of wave

energy conversion back by at least a decade, it also specifically caused tremendous harm to

75

00048

1   Plaintiff's professional reputation, ability to earn a living and likelihood of successfully

2   commercializing Plaintiff's groundbreaking new green energy technology. Indeed, so much so

3   that now Plaintiff has to consider perhaps taking this technology to another country that may be

4   more accepting of it and more appreciative of it as well. By derailing Plaintiff's plans for a

5   much speedier commercial introduction of the GyroGen(TM), technology, many, many

6   millions of dollars (and even perhaps billions of dollars) may have been lost by Plaintiff, which

7   now may never be able to be recovered.

8

9

10   **THIRTEENTH CAUSE OF ACTION**

11   **UNJUST ENRICHMENT**

12   (Against All Defendants Provably Involved)

13   286. Plaintiff re-alleges and incorporates by reference herein each and every allegation

14   contained herein above as though fully set forth and brought in this cause of action.

15   287. By the totality of reasons presented above, Plaintiff was clearly harmed and deprived of

16   benefits which were instead conferred onto others who may not have merited them. But in

17   particular, had Plaintiff won a prize, then many additional benefits and opportunities would

18   have also come, in addition to any prize money. This would allowed Plaintiff to greatly

19   advance the speed of the planned commercial introduction of Plaintiff's *groundbreaking* and

20   likely successful wave energy technology, which could then have helped Plaintiff raise much

21   larger sums of money (both public and private) to have allowed accelerating the introduction

22   76

1 and use of this new source of green energy, that for over 40 years, has been intended to help

2 fight climate change.

3     288. By deliberately and reprehensibly cheating Plaintiff out of any and all opportunity to

4 benefit in any way, from participation in this highly important and supposedly very prestigious

5 event, Plaintiff has now (after more than 7 years) suffered truly devastating reputational harm,

6 loss of income and business opportunities and untold losses from the manufacturing and

7 (international) sale of a potentially revolutionary new technology, whose potential to provide a

8 new source of green energy is untold.

9     289. Instead of Plaintiff having been rewarded for over 40 years of research and

10 development effort, others have instead gotten these rewards in an <u>unjust manner</u> and they will

11 continue to benefit and profit from for many more years to come.

12

13

14

15       **<u>PLEA FOR DAMAGES FOR ALL CAUSES OF ACTION</u>**

16     290. An initial summary of Plaintiff's suggested and desired compensatory and punitive

17 damage awards, which are expected to be fully justified and supported at trial and which are

18 meant to be reasonable in proportion to both the assets held by each accused party, the harm

19 done by the accused defendants to Plaintiff, Plaintiff's family and Plaintiff's business(s) and to

20 the potential future value of Plaintiff's potentially revolutionary new wave energy technology

21 (developed over the course of more than 40 years of very hard and uncompensated work), these

22                         77

1  ***likely irreparable short and long term harms*** can only hope to be partially remedied in a civil

2  court. However the award of very significant compensatory damages, together with appropriate

3  and merited exemplary damages (to compensate for the less tangible and longer term harms

4  that were intentionally inflicted on Plaintiff and Plaintiff's family), could allow the potential to

5  restore Plaintiff and Planitiff's family to a state at least approximating what might have been

6  possible years ago, had it not been for this contest. Such damages should be large enough that

7  they at least begin to make Plaintiff, Plaintiff's family and Plaintiff's business at least

8  somewhat whole again.

9      291. As stated earlier, the potential market for any cost competitive and commercially

10  successful wave energy producing technology, together with the continual delivery of safe and

11  clean electricity to consumers, could exceed $1T/yr. within as little as 20 years and likely up to

12  $100B/yr., within the next decade. GyroGen Technologies, of Michigan, still hopes to become

13  the most successful supplier of ocean energy in the world, and therefore the award of damages

14  sought here could still allow that to become a reality (as was originally planned over 40 years

15  ago and promised to then President Jimmy Carter).

16      292. Respectfully, this court is also being asked to take into consideration that Plaintiff's

17  breakthrough technology might have already have been put to use, more than 20 years ago, had

18  it not been for certain intentional acts having been committed by certain parties intent on

19  slowing down or completely stopping such earlier success. The exact reasons for this are not

20  yet known.

21      293. The total damages that Plaintiff is seeking and will be requesting that a jury approve,

22

78

1   will be based on the adjudicated claims above, together with appropriate and justifiable

2   additional amounts and/or other remedies that would customarily be awarded for such

3   violations of law, especially RICO, and which would be deemed proper and reasonable by a

4   jury, including the normal (modest) expenses incurred in the prosecution of this case, along

5   with any interest or other compensation allowed by law. Each defendant can then be

6   apportioned their share of such compensatory awards and any other relief the Court and Jury

7   may deem proper.

8       294. While subject to the discretion of the Court and a jury, the total of Plaintiff's requests

9   for damages are now approximately $1B (when both compensatory and exemplary damages are

10  combined).

11      295. While large, such an award would not *shock the senses* or be considered excessive,

12  given the circumstances and extent of harm done to Plaintiff's inventive and entrepreneurial

13  spirit, on which he depends for his livelihood. The Court and Jury should also consider the very

14  significant impact that Plaintiff's new renewable energy technology might have already had on

15  efforts to reduce a, now runaway, global warming problem, had it received the funding it may

16  have deserved to get more than 7 years ago. The complete derailment of Plaintiff's technology

17  and business plan, was a direct and entirely preventable result of what Plaintiff feels was the

18  DOE's completely bogus and fraudulent *Wave Energy Prize* competition.

19      296. In the 21st century, new technologies are being invented and commercialized every

20  year that often quickly become valued in the many billions of dollars and, therefore, by

21  comparison with such valuations, what Plaintiff is seeking as reparations would not be an

22

79

exaggerated or excess amount of compensation for the losses suffered by Plaintiff, Plaintiff's family, Plaintiff's businesses, Plaintiff's income, Plaintiff's health, Plaintiff's reputation, not to mention the potential future of the planet's climate. It successful (as expected) Plaintiff's technology could eventually supply up to 10% of the world's electrical energy needs.

Respectfully,

Dated this 20th day of January, 2023

_____

**/s/ GEORGE A. SACHS**

1845 Woodland Ave.
Sylvan Lake, MI. 48320

80

# Attachment 1

## Defendants



# Attachment 2

## Most Direct, Accurate, Simplest & Fairest Methods for New Device Testing*
### (Easily understood & free of *large* cost estimation/prediction errors)

**I) By Comparing Differences in Incoming and Outgoing Wave Heights, or Measuring Electrical Output Into Load (L) Compared to Incoming Wave Power and Energy:**



**2) By Measuring Outputs of Standardized PTOs (Using Identical Dynos or Electrical Generators)**



*Assuming either negligent boundary effects, large tank testing, or identical tank testing

## Dimension Independent Measures of Performance – Publicly Displayable in Real Time:

(Does not require defining a *scale* & allows size optimization based on wave data)

### 1) Power Absorption Efficiency At Time t, Under Load L, PAE(L, t):

PAE(L, t) = 100% * ( IWP(t) − OWP(t) ) / IWP(t) or,
PAE(L, t) = DP(L,t) / IWP(t).

Ideally with [ IWP(t) − OWP(t) ] + DP(L,t) approximately = IWP(t)  (the closer the better).

With energy captured to time T, $DE(L,T) = \int_{0}^{T} DP(L,t)*dt$, or approx. $\sum_{i=1}^{i=N} DP(L,t_i)*\Delta t$,

Where T = N* Δt, so that:

### 2) Average Energy Conversion Efficiency Over Time T, AE(L,T):

AE(L,T) = [DE(L,T)/T] / [IWE(T)/T] = DE(L,T) / IWE(T).

### 3) Scale Independent Measures

Device Power /Max. Device Width = DP(L,t)/W

Device Energy/Max. Device Width = $DE(L,T)/W = 1/W * \int_{0}^{T} DP(L,t)*dt$, or $1/W*\sum_{i=1}^{i=N} DP(L,t_i)*\Delta t$

# Attachment 3

Technical Summaries of Wave Energy Prize Official Qualified Teams | AltEnergyMag

# AquaHarmonics

Portland, Ore.



AquaHarmonics' Wave Energy Device is a point absorber device consisting of a simple Power Take Off (PTO) system mounted in a cone/cylinder shaped hull with a single mooring line that has a power cable at its core.

The PTO System consists of a sheave fixed to a shaft mounted in bearings within a sealed compartment and directly coupled to a pair of axial flux generators. The device only generates power on the rise of the wave, and during the fall of the wave the generators are operated as motors to reel in the mooring line for the next wave cycle.

During reel in, the control system of the device can provide additional energy input to achieve phase locking with any wave frequency. This control method is known as "de-clutching," which has been shown to effectively increase the operational bandwidth of a wave energy device.

# Attachment 4

# OSTI.GOV

# Cycloidal Wave Energy Converter

## Abstract



This program allowed further advancing the development of a novel type of wave energy converter, a Cycloidal Wave Energy Converter or CycWEC. A CycWEC consists of one or more hydrofoils rotating around a central shaft, and operates fully submerged beneath the water surface. It operates under feedback control sensing the incoming waves, and converts wave power to shaft power directly without any intermediate power take off system. Previous research consisting of numerical simulations and two dimensional small 1:300 scale wave flume experiments had indicated wave cancellation efficiencies beyond 95%. The present work was centered on construction and testing of a 1:10 scale model and conducting two testing campaigns in a three dimensional wave basin. These experiments allowed for the first time for direct measurement of electrical power generated as well as the interaction of the CycWEC in a three dimensional environment. The Atargis team successfully conducted two testing campaigns at the Texas A&M Offshore Technology Research Center and was able to demonstrate electricity generation. In addition, three dimensional wave diffraction results show the ability to achieve wave focusing, thus increasing the amount of wave power that can be extracted beyond what was expected from earlier two dimensional investigations. Numerical results showed wave cancellation efficiencies for irregular waves to be on par with results for regular waves over a wide range of wave lengths. Using the results from previous simulations and experiments a full scale prototype was designed and its performance in a North Atlantic wave climate of average 30kW/m of wave crest was estimated. A full scale WEC with a blade span of 150m will deliver a design power of 5MW at an estimated levelized cost of energy (LCOE) in the range of 10-17 US cents per kWh. Based on the new results achieved in the 1:10 scale experiments these estimates appear conservative and the likely performance at full scale will exceed this initial performance estimates. In advancing the Technology Readiness Level (TRL) of this type of wave energy converter from 3 to 4, we find the CycWEC to exceed our initial estimates in terms of hydrodynamic performance. Once fully developed and optimized, it has the potential to not just outperform all other WEC technologies, but to also deliver power at a lower LCOE than competing

**(Underlining Added)**

DE-EE0003635
Cycloidal Wave Energy Converter
Atargis Energy Corporation
Final Scientific Report



**Figure 38: Overall efficiency performance vs. WEC size to wavelength ratio for harmonic and irregular airy waves. An optimally designed WEC in which 2$\rho$R = $\lambda$s as in [3] shows yearly efficiency of 98.3% in a North Atlantic sea state probability.**

In summary, simulation results of wave cancelation in irregular, unidirectional deep ocean waves using a Cycloidal wave energy converter (CycWEC) are presented.  The simulation which has been experimentally validated at the 1:300 scale is a time integrated, inviscid potential flow solution subject to a linearized free surface boundary condition.  Wave irregularity is modeled by the commonly accepted Bretschneider spectrum discretized by 40 components.  The irregular spectrum is varied over a range of standard periods ($T_s$) to represent corresponding sea state variations in a North Atlantic environment. A non-causal Hilbert transformation of the up-wave surface elevation is used to accurately and efficiently estimate the instantaneous frequency, phase and amplitude of the irregular wave surface. A proportional control scheme is adopted to control blade pitch of the CycWEC.  Phase compensation is also necessary to model the group velocity of the irregular wave packets between the up-wave sensor location and the CycWEC. Efficiencies are computed from a control volume analysis by up and down-wave surface elevations.

The efficiency of the CycWEC is shown to be above 85% for the entire range of standard wave periods and above 99% for the optimal design case. The CycWEC efficiency in irregular wave climates aligns very nicely with previously published harmonic efficiency analysis. Annual estimates of efficiency were computed from North Atlantic sea likelihood data and showed that 98.85% of the energy was extracted over the course of a year. These results show that the CycWEC is truly a wave termination device over a large band of irregular waves. In a companion paper, OMAE 2012-83388, the irregular wave cancelation results are verified experimentally.

# Attachment 5

## Representation of Contest Process, Conduct & Funding



DOE $16.5M

$10M

Contest/Gaming Attorneys? - No
Unpaid Outside Experts? - No
Accepted Methods? - No
Public Oversight? - No
IP Attorneys? - No

Travel
Salaries
Facilities
Expenses
Overhead

$6.5M

Ricardo Inc.
J.Z. Consulting
(D)

DOE
(D)

Judges
(D)

NREL
(D)

Consultants
(D)

Sandia
(D)

Academics
(D)

P?- Participant/Defendant?
D - Defendant
E - Eliminated
W - Withdrawn
I - Ineligible

$2.25M

Winners

# Attachment 6


AquaHarmonics Lab Facility


AquaHarmonics Researcher


**Sandia Labs Test Device**
(Notice Shape Similarity)

# Attachment 7
## Relative Sizes of 1/50th Scale Testing Tanks



**Oregon State**
48.8m x 5m x 2.5m

**University of Iowa**
40m x 20m x 3m

**University of Maine**
30m x 9m x 4.5

**Stevens Institute**
100m x 5m x 2.5m

**University of Michigan**
109.7m x 6.7m x 6.35m

## 1/20th Scale Carderock Testing Tank



72.8 m

109.0 m

7.0 m

# Attachment 8
## Initially Proposed and Supportable Damages

| | Direct | Exemplary |
|---|---|---|
| RICARDO INC. / RICARDO PLC, a foreign company having offices in Michigan; | $ 40,000,000 | $ 120,000,000 |
| WESLEY SCHARMEN, as individual; | $ 2,000,000 | $ 4,000,000 |
| PHILIP MICHAEL, as individual; | $ 2,000,000 | $ 4,000,000 |
| JZ CONSULTING LLC; a Michigan corporation; | $ 2,000,000 | $ 6,000,000 |
| JULIE ZONA, as individual; | $ 2,000,000 | $ 6,000,000 |
| POLARIS STRATEGIC COMMUNICATIONS LLC, a Virginia corporation; | $ 1,000,000 | $ 2,000,000 |
| CHRISTINA FUENTES, as individual; | $ 5,000,000 | $ 1,000,000 |
| ERNEST MONIZ, as individual; | $ 2,000,000 | $ 6,000,000 |
| ALISON LABONTE, as individual; | $ 3,000,000 | $ 6,000,000 |
| JOSE ZAJAS, as individual; | $ 2,000,000 | $ 6,000,000 |
| DARSHAN KARWAT, as individual, | $ 2,000,000 | $ 6,000,000 |
| PAMELA BRODIE, as individual; | $ 1,000,000 | $ 2,000,000 |
| STEPHANIE HODGE, as individual; | $ 1,000,000 | $ 2,000,000 |
| GARY NOWAKOWSKI, as individual; | $ 1,000,000 | $ 2,000,000 |
| JOCHEM WEBER, as individual; | $ 3,000,000 | $ 6,000,000 |
| MIT, a Massachusetts private university; | $ 40,000,000 | $ 80,000,000 |
| MIT SEA GRANT PROGRAM & TEAM IOwec, a division of MIT; | $ 30,000,000 | $ 60,000,000 |
| STEFANO BRIZZOLARA, as individual; | $ 1,000,000 | $ 2,000,000 |
| CALWAVE, a California Company; | $ 20,000,000 | $ 40,000,000 |
| MARCUS LEHMANN, as individual; | $ 2,000,000 | $ 4,000,000 |
| M3 WAVE; an Oregon Company; | $ 1,000,000 | $ 2,000,000 |
| MIKE MORROW, as individual; | $ 500,000 | $ 1,000,000 |
| ATARGIS, a Colorado Company; | $ 4,000,000 | $ 8,000,000 |
| STEFAN G. SIEGEL, as individual; | $ 500,000 | $ 1,000,000 |
| OSCILLA POWER, a Seattle Washington Company; | $ 4,000,000 | $ 8,000,000 |
| TIM MUNDON, as individual; | $ 500,000 | $ 500,000 |
| BALAKRISHNAN NAIR, as individual; | $ 500,000 | $ 500,000 |
| JENNIFER VINING, as individual; | $ 500,000 | $ 500,000 |
| RAHUL SHENDURE, as individual; | $ 500,000 | $ 500,000 |
| RTI - MIT WAVE POWER | $ 2,000,000 | $ 4,000,000 |
| JOHN ROHRER, as individual; | $ 1,000,000 | $ 2,000,000 |
| DICK K. P. YUE, as individual; | $ 500,000 | $ 500,000 |
| YUMING LIU, as individual; | $ 500,000 | $ 500,000 |
| SEAN LEWIS, as individual; | $ 500,000 | $ 500,000 |
| SEA POTENTIAL, Rhode Island business; | $ 2,000,000 | $ 4,000,000 |
| TIM MACDONALD, as individual; | $ 500,000 | $ 1,000,000 |
| PAUL BREWSTER, as individual; | $ 500,000 | $ 500,000 |
| SEWEC, a California company; | $ 2,000,000 | $ 4,000,000 |
| NICK WYNN, as individual; | $ 1,000,000 | $ 2,000,000 |
| BYRON BARNES, as individual; | $ 500,000 | $ 1,000,000 |
| CAROL BENNETT, as individual; | $ 500,000 | $ 1,000,000 |
| TOM BENSON, as individual; | $ 250,000 | $ 250,000 |
| CASEY BIRMINGHAM, as individual; | $ 250,000 | $ 250,000 |
| NICHOLAS GRAY, as individual; | $ 250,000 | $ 250,000 |
| SEAN LAVELLE, as individual; | $ 500,000 | $ 500,000 |
| HARVEST WAVE ENERGY; Contest Finalist, location unkown; | $ 2,000,000 | $ 4,000,000 |
| WAVESWING AMERICA, a.k.a AWS | $ 4,000,000 | $ 8,000,000 |
| OCEAN ENERGY is a UK Company that posed as a Califonia Company with the help of Mirko Previsic; | $ 4,000,000 | $ 8,000,000 |
| MIRKO PREVISIC, as individual; | $ 2,000,000 | $ 6,000,000 |
| STEVENS INSTITUTE OF TECHNOLOGY a private N. J. university; | $ 20,000,000 | $ 40,000,000 |
| MUHAMMAD HAJI, as individual; | $ 500,000 | $ 500,000 |
| LEE FINGERSH, as individual; | $ 500,000 | $ 500,000 |
| SCOTT JENNE, as individual; | $ 500,000 | $ 500,000 |
| JAMES GOSE, as individual; (U of M) | $ 500,000 | $ 400,000 |
| KEVIN MAKI, as individual; | $ 250,000 | $ 250,000 |
| TROY LYONS, as individual; | $ 250,000 | $ 250,000 |
| CURTIS LIBBY, as individual; (U of Maine) | $ 500,000 | $ 500,000 |
| ANTHONY VISELLI, as individual; | $ 250,000 | $ 250,000 |
| LOCKHEED MARTIN, a Maryland corporation; | $ 20,000,000 | $ 40,000,000 |
| HONEYWELL INTERNATIONAL INC., a North Carolina conglomerate; | $ 10,000,000 | $ 20,000,000 |
| SANDIA NATIONAL LABORATORIES, a subsidiary of Honeywell International, Inc./previously Lockheed Martin | $ 40,000,000 | $ 120,000,000 |
| VINCENT NEARY, as individual; | $ 2,000,000 | $ 6,000,000 |

# Attachment 8

## Initially Proposed and Supportable Damages

| | | | | |
|---|---|---:|---|---:|
| ANN DALLMAN, as individual; | | $ 500,000 | $ | 1,000,000 |
| BUDI GUNAWAN, as individual; | | $ 500,000 | $ | 1,000,000 |
| DIANA BULL, as individual; | | $ 500,000 | $ | 1,000,000 |
| KELLEY RUEHL, as individual; | | $ 500,000 | $ | 1,000,000 |
| CHARLES MAHER, as individual; | | $ 500,000 | $ | 1,000,000 |
| RE-VISION CONSULTING LLC; a California corporation; | | $ 2,000,000 | $ | 6,000,000 |
| MICHAEL TRIANTAFYLLOU, as individual; | | $ 150,000 | $ | 150,000 |
| NEXT GEN TEAM, | | $ 1,000,000 | $ | 2,000,000 |
| MCNATT OCEAN ENERGY, a Maryland front company for the UK company MOCEAN | | $ 5,000,000 | $ | 10,000,000 |
| CAMERON MCNATT, as individual; | | $ 2,000,000 | $ | 6,000,000 |
| CHRIS RETZLER, as individual; | | $ 500,000 | $ | 500,000 |
| WAVE ENERGY CONVERSION CORPORATION OF AMERICA, a former Maryland company; | | $ 1,000,000 | $ | 2,000,000 |
| BRIAN CUNNINGHAM, as individual; | | $ 250,000 | $ | 250,000 |
| DAVID KREAMER, as individual; | | $ 250,000 | $ | 250,000 |
| EVAN YOUNG, as individual; | | $ 250,000 | $ | 250,000 |
| CHRISTOPHER PRICE, as individual; | | $ 250,000 | $ | 250,000 |
| JIM CLINTON, as individual; | | $ 250,000 | $ | 250,000 |
| JOSEPH J. NEWBERGER, as individual; | | $ 250,000 | $ | 250,000 |
| MANHAR DHANAK, as individual; | | $ 500,000 | $ | 1,000,000 |
| REZA ALAM, as individual; | | $ 500,000 | $ | 1,000,000 |
| PAUL ROTGER, as individual; | | $ 500,000 | $ | 1,000,000 |
| AQUAHARMONICS, a California business; | | $ 4,000,000 | $ | 8,000,000 |
| ALEX HAGMULLER, an individual; | | $ 1,000,000 | $ | 2,000,000 |
| MAX GINSBURG, as individual; | | $ 1,000,000 | $ | 2,000,000 |
| FREDERICK DRISCOLL, as individual; | | $ 1,000,000 | $ | 2,000,000 |
| JEFF SCRUGGS, as individual. | | $ 1,000,000 | $ | 2,000,000 |
| PEDRO LOMONACO as individual | | $ 250,000 | $ | 250,000 |
| DYLAN TEMPLE as individual | | $ 250,000 | $ | 250,000 |
| SCOTT BEATTY as individual | | $ 500,000 | $ | 500,000 |
| ROBERT THRESHER as individual | | $ 500,000 | $ | 500,000 |
| DOES 1-8 (Estimated Total) | | $ 2,000,000 | $ | 2,000,000 |
| **TOTALS** | $ | 322,650,000 | $ | 720,050,000 |

| | | |
|---|---|---:|
| **Direct Damages** | $ | 322,650,000 |
| **Exemplary Damage:** | $ | 720,050,000 |
| **TOTAL** | $ | 1,042,700,000 |